# CHARLESTON.

## E. L. HALL *et al.* v. GEORGE C. BACKUS.

Submitted October 10, 1922.    Decided October 24, 1922.

1. EASEMENTS—*Open, Continuous, Notorious Use of Private Way Over Tract of Another, Unobjected To, Presumptively Adverse.*

    Open, continuous and notorious use by an owner of land, of a private way over an adjoining tract owned by another person, known, acquiesced in, unobjected to and unprotested by the latter, is presumptively adverse to him and enjoyed under a *bona fide* claim of right. (p. 163).

2. SAME—*Adverse User of Private Way for Ten Years Ripens Into Easement by Prescription.*

    Such use for a period of ten years, in the absence of proof of any circumstance altering its character, ripens into perfect title to an easement over the adjoining or neighboring land, by prescription. (p. 163).

3. SAME—*Use of Open Way in Common With Owner of Land Where Located and the Public Presumptively Permissive When Not Exercised Under Exclusive Right.*

    Use of an open way in common with the owner of the land on which it is and the public in general, is presumptively permissive and not exercised under a claim of right, in the absence of proof of some act on the part of the person so using it, or circumstance under which he used it, showing a claim of exclusive or peculiar right in him, distinct from that of the general public. (p. 163).

4. SAME—*Use of Open Way, Commenced in Exclusive and Adverse Manner, Does Not Lose Adverse Character by Reason of Subsequent Joinder of Public.*

    If user of such a way, commenced in such manner as to make it exclusive, peculiar and adverse, is afterward enjoyed in common with the public, it does not lose its adverse character by reason of the joinder of the public therein. (p. 163).

5. SAME—*Road, at Inception of Use Leading Only to Premises of Person Using it, Sufficient to Prove Exclusive Right.*

    If a road, at the inception of its use, led only to the premises of the person using it, that circumstance is sufficient to prove his use thereof under a claim of exclusive, peculiar

and distinct right, in the absence of proof of the contrary thereof. (p. 163).

Appeal from Circuit Court, Nicholas County.

Suit by E. L. Hall and others against George C. Backus. From an order dissolving a preliminary injunction to restrain defendant from obstructing a private way, plaintiffs appeal.

*Reversed; Injunction reinstated and perpetuated.*

*Horan & Horan* and *G. G. Duff*, for appellants.
*W. G. Brown*, for appellee.

POFFENBARGER, PRESIDENT:

The five plaintiffs in this suit, citizens of the unincorporated village of Vaughan, filed their joint bill for vindication of their alleged rights to easements over a certain piece of land owned by the single defendant, private ways of identical location, appurtenant to their lands. Being of the opinion that their claims were not well founded, the court below, upon final hearing, dissolved the preliminary injunction awarded to restrain the defendant from obstructing the way in controversy and dismissed the bill. No questions of practice have been raised on this appeal from the decree. The sole inquiry is whether the cause has been correctly decided upon its merits. In the more than 600 pages of evidence, the salient and controlling facts are fairly well disclosed, but some omitted details would have been helpful, if given. The bill is grounded upon three theories; special interest of the plaintiffs in the road as a· public highway; necessity giving rise to a private way; and prescription vesting title to such way, under the statute of limitations.

Vaughan is situated on Twenty Mile Creek at the mouth of Rock Camp Branch. The general course of Twenty Mile Creek at this point is east and west, the creek flowing towards the west, and Rock Camp Branch enters it from the north. The village is built upon two tracts of land lying on the north side of Twenty Mile Creek, east of Rock

Camp Branch, acquired by William L. Walker from A. J. Rippetoe and others, July 5, 1867, and Hannah Rippetoe, January 27, 1879, by deeds conveying, respectively, 50 acres and 25 acres. Out of these lands, William L. Walker made a number of conveyances. In 1893, he conveyed a large lot fronting on Twenty Mile Creek to Benjamin Darlington, his son-in-law, which Darlington later conveyed to the Bank of Gauley, a part of which is now owned by T. C. Vance and another part by Mrs. J. V. Bailey. On the lot conveyed to him, Darlington built a store house in 1893, and conducted a mercantile business therein, until 1905, in connection with which, he held the post office for about 12 years. He still resides on apart of the property so conveyed to him and afterwards, by him to the Bank of Gauley. In 1900, W. L. Walker and wife conveyed a lot to H. L. Fagan, which seems to have adjoined the Darlington lot. In 1906, he conveyed to the Trustees of Vaughan Lodge No. 112, Knights of Pythias, another small lot adjoining the one conveyed to Fagan. About the year 1901, he conveyed to James M. Walker about twenty acres of the land lying farther up the stream, which was afterwards sold in judicial proceedings and bought by Benjamin Darlington. E. L. Hall acquired an interest in the lot that came out of the property conveyed directly to Darlington by Walker. Out of the residue of the Rippetoe tract, lying west of the William L. Walker tract and between it and Rock Camp Branch, said Hall acquired title to another piece of land, to the enjoyment of which the road in question is advantageous, if not necessary. Between the Hall property last mentioned and the small lot acquired indirectly by Fagan from Walker and adjoining the lot of the Knights of Pythias, lies the property of the defendant G. C. Backus, which is a part of the William L. Walker 50 acre tract. This Backus tract contains 7.71 acres, but it borders on Twenty Mile Creek only about 186 feet. It is the part of the road that crosses this end or corner of the defendant's tract of land that has been obstructed by him, upon the theory that his neighbors owning the land above and below it, have no right or title of any kind to a way over it.

Before the James M. Walker property was acquired by Darlington, William L. Walker and James M. Walker by deed dated, November 12, 1904, leased to the Advance Lumber Company, all of their bottom land bordering on Twenty Mile Creek and a strip thereof extending up on the hillside for a distance of 100 feet, for a period of fifteen years, to be used as a mill-site, in connection with which and over which a logging railroad was to be built and operated, as well as other facilities for the handling of logs and manufacture of lumber. This lease omitted a strip of land along and upon the bank of Twenty Mile Creek, which it designated as a road or street. It is referred to as a street in several places by the lease. But, whether there was such a street or road, at that time, is one of the subjects of controversy in the suit. Soon after the date of this lease, the Advance Lumber Company, disposed of its lease to the West Virginia Timber Company, which located its mills on the land and operated them there for several years. From and after the date of the commencement of operations under the lease, by the West Virginia Timber Company, the so-called street was used constantly, by residents of the village and all others who had occasion to use it, by running vehicles thereon and in travel on foot and on horseback, without interruption, until May, 1921. At that time, which was about a month after the defendant acquired his property, he commenced the construction, of a building which, if completed, will occupy a considerable part of the road in question, as it is located upon his land, and preclude maintenance thereof on top of the creek bank, by reason of lack of space between the building and the bank.

William L. Walker lived eight or nine years, after the execution of the lease just mentioned, resided on the unsold portion, of his land and died about the year 1913. Before his death, several houses had been built on the property he had conveyed, and it seems he constructed several additional houses on the unsold portions of the land, which he rented. Sometime after his death, two of his daughters, Martha J. Darlington and Hannah A. Happenny, brought

a suit in chancery for partition of his unsold land, against Mary E. Fox and others, in which a final decree was entered on April 16, 1920. In that case, there was awarded to Hannah A. Happenny the 7.71-acre tract now owned by the defendant Backus. It was conveyed to him by a deed dated April 9, 1922. It seems that neither the pleadings, the decree, the report of the commissioners nor the plat made in connection with the partition mentioned the alleged road along Twenty Mile Creek or referred to it; but other roads were provided through the property so as to give outlets to all of the parties among whom the lands were divided. These newly provided roads were so arranged that one of them come down to Twenty Mile creek, between the lands of the defendant and the small lot belonging to Fagan and adjoining the Knights of Pythias property.

There are now forty or fifty houses in the village and it seems that most of them are situated in the bottom land on the north side of Twenty Mile Creek and east of Rock Camp Branch. Many of them are built with reference to the road along the north bank of the creek. The railway station, post office and school house seem to be located in the western end of it on or near Rock Camp Branch, and, in reaching them, it is necessary for the residents of the central and eastern parts of the village to use the road along the north side of Twenty Mile Creek, or to cross that creek and use the county road located on the south side thereof. There is testimony tending to prove that the stream is fordable at several points along the front of the village and at one place there is a private foot bridge across it. At the upper or eastern end of the village, the county road crosses Twenty Mile Creek and runs down the stream, not parallel therewith, but at some distance from it for the greater part of the way, and again crosses that creek at the mouth of Rock Camp Branch, there intersecting another county road coming down Rock Camp Branch and crossing Twenty Mile Creek at the mouth of Rock Camp Branch and continuing west on the south side of Twenty Mile Creek. The West Virginia Timber Company mills seem to have been located on the north side of Twenty

Mile Creek, at the east or upper end of the village, near what is known as the Rippetoe grist mill, and to have been connected by rail with the C. & O. Railway, at the mouth of Rock Camp. The exact location of the line from the C. & O. station to the mill is not clearly described.

Although a public status or character is attributed to the road in question, by the allegation of the bill, a correct interpretation of that instrument would probably limit it to assertions of private easements founded upon necessity and prescription. However that may be, no effort was made to prove the status of the road, as a public highway. There is no evidence tending to prove that it ever was accepted as such by the public authorities. As the village is not incorporated, it had no such authorities by whom acceptance of the alleged dedication could have been made, and it is not pretended that the county authorities ever occupied, used or recognized the road as a highway. A public highway is not established by dedication alone. Its establishment requires acceptance by the public authorities, as well as dedication by the land owner. *Talbott* v. *King*, 32 W. Va. 6; *Ball* v. *Cox*, 29 W. Va. 407.

Being of the opinion that the plaintiffs are entitled to private ways acquired by prescription, we refrain from inquiry as to whether any of them are entitled to such ways arising by implication out of necessity.

The first conveyance made by William L. Walker, namely, the one of 1893, to Benjamin Darlington, provided no right of way over that lot. Although he had land both above and below it, he reserved no road over it. He conveyed to the center of Twenty Mile Creek. In the conveyances subsequently made to Fagan and the Trustees of the Knights of Pythias lodge, he adopted a different method. Those conveyances did not go to the center of the stream nor to the top of the bank. He retained a strip on the bank about fifteen or twenty feet wide, in each case. From 1893 until 1904, Darlington and other persons owning or occupying the lands so granted to him made constant and uninterrupted use of the strip of land along the bank. As to this, there is no con-

troversy except as to the character of the use. Many witnesses say there was no road on the strip, suitable for vehicles or used by them, and that the way, at that time, was a mere path used by footmen and people traveling on horseback. On the other hand, a number of witnesses say there was a wagon road on that strip. The evidence puts it beyond doubt, that, from 1893, there was some sort of an open way from the Darlington property over the residue of the Walker property, running west along the creek bank. There is little if any evidence, however, of the existence of any road or way across the Darlington property and the residue of the Walker property, leading in the other direction, until the West Virginia Timber Company began its operations. James M. Walker bought the twenty acres of land lying in the eastern part of what is known as the village of Vaughan in 1901. There may have been some buildings on that twenty acres at that time. It is certain that, later, when Darlington bought it at the judicial sale, it had several buildings on it. When they were built is not disclosed by the evidence, nor does it appear that James M. Walker or any of his tenants used the road in question prior to 1904. As to what conditions obtained in that end of Vaughan prior to that date, the evidence is rather slight and indefinite.

The conditions obtaining after the West Virginia Timber Company began operations in 1904 or 1905, are fairly well indicated by the evidence. All of the witnesses agree that there was an open wagon road all along the north bank of Twenty Mile Creek, passing over the land now owned by the defendant, the unconveyed strips of land in front of the Fagan property and the knights of Pythias property and the Darlington property, and extending from the mouth of Rock Camp Branch to the point at which the county road crosses the north side of the creek, at the upper end of the village. That this use of the way continued for such length of time as to vest title, is not denied. But the effect of it is resisted upon the grounds that it was permissive, that it did not take place under a *bona fide* claim of right and that the plaintiffs

are estopped as to the rights they claim, by the partition and their subsequent conduct.

There is no tendency in any of the evidence to prove an expressly permissive use of the road. The plaintiffs and those under whom they claim used it as of right, without permission and without objection. Wm. L. Walker objected to the hauling and selling of coal in competition with him, on a few occasions, but it is by no means clear that his objection always went to the hauling of coal over the road now in question. He had another road, private in its nature, leading out through his unsold lands, on which some of the hauling objected to seems to have taken place. This objection is not shown to have been brought to the attention of any of the plaintiffs except Vance, who claims under Darlington and it was not made to him earlier than 1913. If Darlington is right in his contentions it came too late to avail anything. It could not take away a right already vested. The use of the road as described by the witnesses makes out a *prima facie* case of non-permissive use. *Roberts* v. *Ward,* 85 W. Va. 474; *Walton* v. *Knight,* 62 W. Va. 223. There are some circumstances, however, which may indicate an impression on the part of Walker, that the easement in question had not been acquired from him. In his conveyance to the Trustees of the Knights of Pythias lodge, he granted them a right of way in a portion of the strip of land. In this, however, there is no real significance. The grantees in that deed had acquired no right and the rights of others could not avail them. It was necessary to give them an outlet and the fact that it was not made identical and coextensive with rights acquired by others has no real tendency to disprove such other rights. Of course, it may reflect intent or impression on the part of the grantor, as to the status of the strip of ground, but the element of intention does not enter into this inquiry. The question is whether rights have been acquired by the plaintiffs, without regard to the will or intent of William L. Walker. Ten years of known user without objection, under a *bona fide* claim of right, confers title, no matter what the servient owner may have thought or intended. He performs

his part in the transaction by remaining silent while the other party acts.  Close scrutiny of the terms of the grant of an easement, found in the deed, eliminates the ground of the inference claimed.  It grants a way to the ford which is not on the road in question, but is a part of what is known as Walker's private road.  For that purpose a specific grant was necessary.  To reach the ford it was necessary to go down the street and the deed describes that way as going ''down the street'' to the ford.  The plain purpose of this clause was to confer right to use the ford to which the grantor's private road, not this road, led from another direction.  Moreover, what transpired between him and the Knights of Pythias has no tendency to prove any transaction or relation between him and Darlington, Bailey, Vance and Hall.  If it be true that he declared to certain persons that his purpose in retaining the strip of land along the creek was a conveyance of it for a railroad right of way, there is no proof of knowledge of that fact on the part of the plaintiffs.  They are not affected by purposes of his not known to them.  In this connection, we repeat that his intention is not necessarily material.  Its materiality depends upon how it was expressed and to whom.

There is no denial in the evidence that from 1893 to 1904, a period of eleven years, Darlington and others patronizing his store and the post office kept in it, used some kind of a way from the mouth of Rock Camp along the north side of the creek to the store.  The witnesses differ only as to its character and extent.  In the evidence, no restriction upon travel along that way is found, in so far as it was located on the Walker land.  Those who deny the existence of a wagon road base their evidence upon their recollection as to whether there was such a road over the Rippetoe land, adjoining the Walker land on the west and lying between it and the mouth of Rock Camp. They say there was space between Rippetoe's fence and the bank only wide enough for footmen and horses.  The West Virginia Timber Company obtained rights in the Rippetoe land as well as in the Walker land, and its operations necessitated removal of fences and the use of ad-

ditional ground for travel and hauling, in respect of both tracts. The argument of the defendant, his witnesses and counsel is that, as there was only a path through the Rippetoe land, there could have been nothing more through the Walker land. As to whether there was a wagon road through this adjoining land, there is conflict. Some of the witnesses denying it were uncertain as to the time at which admittedly there was such a road. All admit there was none before 1893, the apparent date of the completion of a branch of the C. & O. Railway to Vaughan. Some of the defendant's witnesses admit that the Rippetoe fence was moved back twice. Others knew there had been a time when there was no wagon road between it and the creek bank, but when questioned as to whether that condition continued after 1893, they could give no definite answer. Others admitted it did not. E. R. Morton, on cross-examination, said it was his recollection that shortly after completion of the railway station, there was an open road to Darlington's store, but not beyond it. Lloyd Coleman, another witness for the defendant, on cross-examination said that, as well as he remembered, there was a wagon road from the station to Darlington's store, "when he first put the store up." J. S. Darlington, testifying for the defendant in chief, made alike admission in his cross-examination. To these may be added Walker Keith, J. A. Backus and B. F. Grose. Their testimony on this point supplements that of nineteen witnesses for the plaintiffs, most of whom are positive and emphatic in their assertions of the existence of the road. About fourteen witnesses for the defendant deny it, a few of them positively, but most of them merely upon recollection.

As has been observed, the plaintiffs and their predecessors in title have used and enjoyed the road in question, since 1904 or 1905. If their use of it was such in point of character as the law requires for purposes of acquisition of title by prescription, it was clearly of sufficient duration. Moreover, it was not expressly permissive. If it was impliedly permissive or not under claim of right, these defects are attributable to the circumstance that the user was in common

with the general public.  For this reason, it would be difficult
to maintain its sufficiency, if we were limited to consideration
of the facts as they were after 1904.  The plaintiffs used the
road in much the same manner as other people did.  Nothing
in the manner of their use indicated a claim of exclusive or
special right in them, distinct from the permissive right ac-
corded by the owners to the general public, which would not
bind. One using an open way in common with the general pub-
lic obtains no easement, unless he, in some way, distinguishes
his use from that of other people.  *Roberts* v. *Ward*, 85 W.
Va. 474.

The exact ground of the trial court's decision is not dis-
closed by the record.  In view of the admitted state of facts
after 1904, it can hardly be supposed that there was a find-
ing against continuous user of a wagon road throughout that
period.  The timber company's cars blocked it at crossings
more frequently and extensively than they would have inter-
rupted travel over a public highway, but that is a circum-
stance of no real significance.  The user went on daily. Never-
theless, the court may have eliminated this period on either
of two grounds: (1) lack of continuity of the user, or (2), its
promiscuous character.  If either of these grounds or views
was adopted, the conflict in the evidence, as to the existence
of the road prior to 1904, may not have been passed upon.
Again, as Darlington bought his land in 1893, and presump-
tively opened his store later, the trial court may have con-
cluded that the road, if opened in connection with the store,
was not opened and used ten years before the timber com-
pany began its operations resulting in promiscuous use. Hence
it is not clear that there has been a finding against the ex-
istence of a wagon road over the defendant's lands before
1904.  In our opinion there is a clear preponderance of evi-
dence in favor of it.  The coming of the C. & O. Railway in
1893, the opening of the Darlington store, the location of
the post office therein, the conveyances to Fagan and James
M. Walker, the starting or enlargement of the village and the
altered situation of the Rippetoe store, taken in connection
with the character of Twenty Mile Creek, it being impas-

sable during considerable portions of the year, all argue the virtual necessity of such a road. After that event, Rippetoe no doubt obtained his goods by rail and they came whether the creek was high or low. Vaughan became a sort of distributing center and its inhabitants, all living on the north side of the stream, increased in number. Many of the witnesses for the plaintiffs say they actually used the road, prior to 1904, and there is a very decided numerical preponderance of witnesses in favor of such use. We are of the opinion that there was a wagon road over the defendant's land, prior to 1904.

Its character at that time repelled the imputation of promiscuousness. It was not then used by the public in such sense as to make it implicitly or presumptively permissive. It was not a way open to general travel nor used in such travel. Those who came in over it, came on business with the owner's and occupants of the properties to which it led, or as their guests. They used it under and in subordination to the rights or claims of such owners. The road stopped at the Darlington store. It led to his premises passing those of Fagan. It was not a way connecting two highways or leading to a village, church, school, cemetery or other public place. In these circumstances, there is found clear and potent evidence of exclusive and non-promiscuous use. Having been exclusive in its inception, it did not lose that character, by reason of subsequent public use incident to the operations of the timber company. There was nothing in the extension of the road and enlargement of its use, indicative of any change of intent or purpose on the part of Darlington, Fagan and others claiming under them. If a private way is enlarged into a public way, the private easement is not merged, and discontinuance of the way, as a public one, does not destroy the easement. Jones, Easements, secs. 245-6. The transaction which admitted the general public to the use of the way was one between Walker and the timber company. Those previously exercising private right in the way had nothing to do with it, wherefore their intent and purpose cannot be deemed to have been altered by it. Though the user prior to

1904 may not have been of sufficient duration to vest title, it gives character to it as continued after that date and makes it adverse. · As so continued it was amply sufficient in point of duration.

At the time of his purchase made in 1900, Fagan had some sort of a way of necessity. His lot was bounded on the east by that of Darlington and on all other sides by lands retained by Walker. To get to the county road beyond the creek, it was necessary for him to pass over Walker's land lying between him and the creek. On that land, there was an apparent road leading down to the station at the mouth of Rock Camp, the road Darlington used, whatever its condition may have been at that time. He used it in connection with his purchase and has since continued to do so. What has been said respecting the Darlington right is clearly applicable to his case. His use was exclusive or special in its inception and its character as to intent and purpose has not been altered by the enlargement thereof or change therein.

No force is perceived in the argument of preclusion of right by estoppel, founded upon the partition and subsequent conduct of the parties thereto. The rights here involved are claimed as appurtenances to lands not included in the partition, although Darlington's wife and the heirs of Mrs. Fagan were parties to the suit. Omission of reference to the road in question, in that proceeding, may or may not signify intent not to recognize the road, as a public or private one, but its existence as a private way is in no sense dependent upon the decree in that cause or the intentions of the parties thereto. The decree involved no lands that had been sold in the life time of Walker as had all those in respect of which the way is here recognized. The only question we have here is whether the land assigned to Hannah Happenny and by her conveyed to the defendant is subject to that way as appurtenant to the Darlington and Fagan lots. Nothing in the record suggests disposition by the partition, of the strip between the creek and the Fagan and Knights of Pythias properties. It does not appear to have been assigned to anybody. The new roads provided by the decree were apparently in-

tended as outlets for the several lots into which the unsold lands were divided. As bearing upon the question of intentention of the parties to the partition, if that were important, it is uncertain and equivocal. All of the changes made in the road, after the partition, occurred in the east end of the village and on a part of the road not involved in the cause as we dispose of it. No obstruction of that part is complained of in the bill.

Upon these principles and conclusions, the decree will be reversed, the injunction reinstated and perpetuated and the cause remanded.

*Reversed; Injunction reinstated and perpetuated.*