688 S.E.2d 610

**Kenneth Dale NEWMAN and Marty Lee Newman, Appellants,**

v.

**James E. MICHEL, Jr. and Tomasina Michel, Appellees.**

No. 34332.

Supreme Court of Appeals of West Virginia.

Submitted April 7, 2009.

Decided June 11, 2009.

Charles K. Gould, Esq., Arnold J. Janicker, Esq., Jenkins Fenstermaker, PLLC, Huntington, WV, for Appellants.

Paul T. Farrell, Esq., Farrell, Farrell, & Farrell, Huntington, WV, for Appellees.

KETCHUM, J.:

This is an appeal of two orders entered by the Circuit Court of Cabell County finding that the appellants did not have an easement of any kind across the appellees' property. First, the circuit court entered a summary judgment order finding, as a matter of law, that the appellants did not have an easement appurtenant across the property. Second, after a one-day bench trial, the circuit court entered a final judgment order holding that the appellants had failed to demonstrate, by clear and convincing evidence, that they had a prescriptive easement across the appellees' property.

After careful consideration of the trial transcript and evidence, the briefs and arguments of the parties, and all legal authority cited, we affirm the circuit court's rulings in favor of the appellees.

## I.

### Facts and Background

The appellants, brothers Kenneth and Marty Newman, own a 77–acre tract of real property in Cabell County, West Virginia. The Newman property is an old family farm that has been owned by the Newman family since the late 1800's. Neither the Newman brothers, nor anyone else, currently lives on this property. They visit it approximately 7 to 14 times a year.

The Newman property is bordered on its southern, eastern and northern sides by property owned by the appellees, James and Tomasina Michel.[1] The Michels purchased their property in 1973 and have resided on it continuously since then.

The parties' dispute is over whether the Newmans have an easement across the Michels' property to access the Newman family farm.

The genesis for the parties' dispute was in 1940, when the Newman property was owned by, and lived on by, the appellants' grandmother, Ida Newman. At that time, the property could be accessed by following County Road 26 easterly across what is now the southern part of the Michels' property, and then turning left onto a road—described in the record as "the Old Road"—that went north across the Michels' property and connected to the southern edge of the Newman property.

Near its intersection with the Old Road, County Road 26 ran alongside the north bank of the Mud River, and was occasionally impassable due to flooding. To provide an alternate route to the Newman family home, Ida Newman's son, T.M. Newman—who lived on but did *not* own any interest in the Newman property—in 1940 obtained a written "easement or right of way for road purposes only" from one of the Michels' predecessors in interest, Gladys and Cyril Elwell. This easement turned off of County Road 26 at the southwest edge of the Michels' property, and proceeded across the Michels' property approximately 980 feet northeast before connecting with the Old Road, also on the Michels' property. The Old Road continued north approximately 900 feet to the southern border of the Newman property. This easement allowed the Newman family to avoid County Road 26 when it was flooded and traverse a course that is currently the Michels' driveway.

In 1946, six years after the easement agreement was signed between T.M. Newman and the Elwells, T.M. Newman died.

---

1. The Newman property is bordered on its western side by property whose owner is not a party to this case.

Still, the Newman family continued using the T.M. Newman easement after his death. The Newman family, including the Newman appellants (who were children at the time), moved from the family farm to Barboursville, West Virginia in approximately 1955. The Newman family continued to use the property for occasional recreational and farming purposes, and continued to access it by using the T.M. Newman easement until 1963.

In 1963, the Michels' immediate predecessor in title, Emma and Gary Fletcher, built a house on their property, the same house that the Michels reside in today. This house was built across the upper end of the T.M. Newman easement. After this house was built, the Newmans developed a new roadway, a "spur," around the new house. Apparently, the Fletchers did not give the Newman family permission to build and use the spur, but there is also no evidence the Fletchers challenged their use of it.

The Fletchers sold this house and the surrounding property to the Michels in 1973. After the Michels bought this property, the Newmans continued to proceed up the Michels' driveway and use the spur connecting with the Old Road that lead to their property. James Michel testified that the Newmans had his permission to use his driveway and the spur.[2] The Newmans testified that, like the previous owners, the Michels did not give them explicit permission to use the driveway and the spur, nor did they ask them to leave or tell them that they were not allowed to use it.

The last member of the Newman family to live on the property, Steve Newman, died in 1973. In 1975, the family home on the Newman property burned down and has not been re-built. Since the mid–1970s, the Newmans' visits to their property have been irregular, around 7 to 14 times a year.

Additionally, over the years, County Road 26—the original access leading to the Newman land—fell into disrepair. The road became overgrown with trees and brush, and was damaged by flooding from the Mud River, such that it was not accessible by vehicle.

It could, however, be traversed on foot to the beginning of the Old Road.

From 1973 until 2003, there was nothing more than minor disagreements between the Newmans and the Michels. Then, in 2003, the Newmans found the Michels' driveway blocked by a locked metal gate. The Newmans also found that Mr. Michel had erected fencing across County Road 26, beyond the end of the Michels' driveway, ostensibly to prevent cattle from coming onto his land. However, at oral argument before this Court, counsel for the Michels stated that the fence across County Road 26 had been removed and is no longer there.

Following this dispute over the locked gate and fence, the Newmans filed this lawsuit to enforce the T.M. Newman easement. A one day bench trial was held in the Circuit Court of Cabell County on June 4, 2007. However, before the bench trial began, the circuit court considered cross-motions for summary judgment on whether the T.M. Newman easement was an easement in gross (that is, it was solely for T.M. Newman's use), or was an easement appurtenant (that is, it was connected to the Newmans' and Michels' properties and bound future owners). The circuit court found that because T.M. Newman never had an ownership interest in the Newman property, the easement could not attach to and run with the land. The circuit court therefore concluded that the T.M. Newman easement was in gross and had expired upon T.M. Newman's death in 1946. The circuit court therefore granted summary judgment to the Michels on this issue.

Following this ruling, the parties proceeded to trial on the sole remaining issue of whether the Newmans had established a prescriptive easement across the Michels' property. On September 13, 2007, the circuit court issued an order finding that the Newmans' and their ancestors' use of the Michels' driveway began permissively and that there was no subsequent act manifesting an adverse or hostile claim which would convert the use from being permissive into being prescriptive. The circuit court therefore found that the Newmans failed to meet their

**2.** James Michel withdrew this permission on the day of the trial. He stated, "As of today, after this, no. They're not going to have permission to use it."

burden of establishing, by clear and convincing evidence, that they had a prescriptive easement over the Michels' driveway.

The Newmans now appeal the circuit court's summary judgment ruling that the T.M. Newman easement was an easement in gross, rather than an easement appurtenant, and its judgment after the trial that the Newman family's post–1946 use of the T.M. Newman easement and the spur did not constitute a prescriptive easement.

## II.

### Standard of Review

■ "A circuit court's entry of summary judgment is reviewed *de novo.*" Syllabus Point 1, *Painter v. Peavy*, 192 W.Va. 189, 451 S.E.2d 755 (1994). We apply the same review process as the circuit court, which is: "A motion for summary judgment should be granted only when it is clear that there is no genuine issue of fact to be tried and inquiry concerning the facts is not desirable to clarify the application of the law."

■ Our standard of review of a circuit court's judgment after a bench trial was set out in Syllabus Point 1 of *Public Citizen, Inc. v. First Nat. Bank in Fairmont*, 198 W.Va. 329, 480 S.E.2d 538 (1996):

> In reviewing challenges to the findings and conclusions of the circuit court made after a bench trial, a two-pronged deferential standard of review is applied. The final order and the ultimate disposition are reviewed under an abuse of discretion standard, and the circuit court's underlying factual findings are reviewed under a clearly erroneous standard. Questions of law are subject to *de novo* review.

■ A circuit court's finding is clearly erroneous when "although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Bd. of Educ. of County of Mercer v. Wirt*, 192 W.Va. 568, 579, 453 S.E.2d 402, 413 (1994), *quoting United States v. Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 92 L.Ed. 746 (1948). However, we exercise complete and independent review over the circuit court's interpretation and conclusions of law. *Phillips v. Fox*, 193 W.Va. 657, 661, 458 S.E.2d 327, 331 (1995).

## III.

### Discussion

The Newmans make two arguments in this appeal. First, the Newmans argue that the circuit court erred in finding that the T.M. Newman easement was in gross. Second, assuming that the circuit court did not err, and the T.M. Newman easement was in gross and terminated at the time of his death in 1946, then the Newmans argue that the circuit court erred in finding that the Newmans did not obtain a prescriptive easement over the course of their post–1946 use of the Michels property.

■ Before addressing the Newmans' arguments, we begin with the general definition of the term "easement." "An easement may be defined as the right one person has to use the lands of another for a specific purpose and is a distinct estate from the ownership of the soil itself." *Kelly v. Rainelle Coal Co.*, 135 W.Va. 594, 604, 64 S.E.2d 606, 613 (1951), *overruled in part on other grounds by Kimball v. Walden*, 171 W.Va. 579, 301 S.E.2d 210 (1983). *See also Restatement (Third) of Property* § 1.2(1)(2000) ("[a]n easement creates a nonpossessory right to enter and use land in the possession of another and obligates the possessor not to interfere with the uses authorized by the easement.").[3]

■ The land benefitting from an easement is called the *dominant estate;* the land

---

3. *Black's Law Dictionary* (8th ed. 2004) defines an "easement" as:

> An interest in land owned by another person, consisting of the right to use or control the land, or an area above or below it, for a specific limited purpose (such as to cross it for access to a public road). The land benefitting from an easement is called the *dominant estate;* the land burdened by an easement is

called the *servient estate.* Unlike a lease or license, an easement may last forever, but it does not give the holder the right to possess, take from, improve, or sell the land. The primary recognized easements are: (1) a right-of-way, (2) a right of entry for any purpose relating to the dominant estate, (3) a right to the support of land and buildings, (4) a right of light and air, (5) a right to water, (6) a right to

burdened by an easement is called the *servient estate*.

It is essential to the existence of an easement, which is appurtenant to land, that there be two distinct estates or tenements, the dominant to which the right belongs, and the servient upon which the obligation rests.... The term easement and the term servitude are often used indiscriminately; the one is usually applied to the right enjoyed, the other to the burden imposed. A right of way over the land of another is an easement in the dominant estate and a servitude upon the servient estate.

*Cottrell v. Nurnberger*, 131 W.Va. 391, 397, 47 S.E.2d 454, 457 (1948). (Citations omitted).

 In this case, the Newmans assert that the Newman property is the dominant estate, and that the Michels' property is the servient estate. The burden of proving the existence of an easement rests on the Newmans. As we held in Syllabus Point 1 of *Berkeley Development Corp. v. Hutzler*, 159 W.Va. 844, 229 S.E.2d 732 (1976), "The burden of proving an easement rests on the party claiming such right and must be established by clear and convincing proof."

### A. *Easement appurtenant or Easement in gross*

 The first issue we address is whether the circuit court was correct when it found

that the T.M. Newman easement was in gross, rather than an easement appurtenant, and granted summary judgment to the Michels on this issue.

 "An easement appurtenant is a right to use a certain parcel, the servient estate, for the benefit of another parcel, the dominant estate. Essentially, an easement appurtenant serves the owner of the dominant estate in a way that cannot be separated from his rights in the land." *Hodgins v. Sales*, 139 Idaho 225, 230, 76 P.3d 969, 974 (2003) (internal citation omitted). *See also*, Syllabus Point 1, *Jones v. Island Creek Coal Co.*, 79 W.Va. 532, 91 S.E. 391 (1917) ("If an easement granted be in its nature an appropriate and useful adjunct of the dominant estate conveyed, having in view the intention of the grantee as to the use of such estate, and there is nothing to show that the parties intended it as a mere personal right, it will be held to be an easement appurtenant to the dominant estate.").

 An easement appurtenant may therefore be thought of as the right to use a certain parcel of land that is called a servient estate, a right that is attached—*i.e.*, appurtenant to—the dominant estate. A survey of other jurisdictions reveals similar descriptions of appurtenant easements.[4] The main features of an easement appurtenant are that

do some act that would otherwise amount to a nuisance, and (7) a right to place or keep something on the servient estate.
We gave a similar, detailed definition of the term in *Town of Paden City v. Felton*, 136 W.Va. 127, 136, 66 S.E.2d 280, 286 (1951), where we said (with citations omitted):

An easement in real estate is an interest in land and for every such easement there must be two distinct estates or tenements, the dominant to which the right belongs, and the servient upon which the obligation rests. It is an incorporeal hereditament and may be created in various ways. The general rule, subject to several exceptions, is that an easement can be created only by grant, express or implied, or by prescription, which presupposes a grant. An easement may, however, be created by agreement or covenant as well as by grant. Many authorities say that, as an exception to the general rule just stated, an easement may sometimes be created by estoppel. One eminent authority states that an easement may be

created or acquired by six different methods: express grant, reservation or exception in a deed, implied grant, prescription, a statutory proceeding usually under the power of eminent domain, and estoppel.

4. *See Windham v. Riddle*, 381 S.C. 192, 201, 672 S.E.2d 578, 583 (2009) ("[A]n appurtenant easement inheres in the land, concerns the premises, has one terminus on the land of the party claiming it, and is essentially necessary to the enjoyment thereof."); *U.S. v. Blackman*, 270 Va. 68, 613 S.E.2d 442 (2005) ("An easement appurtenant, also known as a pure easement, has both a dominant and a servient tract and is capable of being transferred or inherited. It frequently is said that an easement appurtenant 'runs with the land,' which is to say that the benefit conveyed by or the duty owed under the easement passes with the ownership of the land to which it is appurtenant."); *Lewitz v. Porath Family Trust*, 36 P.3d 120, 122 (Colo.App., 2001) ("an easement appurtenant is an 'incorporeal right' attached to

there must be both a dominant and servient estate; the holder of the easement must own the dominant estate; the benefits of the easement must be realized by the owner of the dominant estate; and these benefits must attach to possession of the dominant estate and inhere to and pass with the transfer of the title to the dominant estate.

The definition of easement in gross relied upon by this Court in *Ratino v. Hart,* 188 W.Va. 408, 411, 424 S.E.2d 753, 756 (1992) (*per curiam* ), was as follows:

An easement in gross is not appurtenant to any estate in land or does not belong to any person by virtue of ownership of estate in other land but is mere personal interest in or right to use land of another; it is purely personal and usually ends with death of grantee.

 Unlike an easement appurtenant, an easement in gross does not run with the land and creates no dominant or servient estates. See *Restatement (Third) of Property: Servitudes* § 1.4(2) (2000). Other courts have stated that an easement in gross is purely personal and usually ends with the death of the grantee. *Shingleton v. State,*

and belonging with some other parcel of land. It runs with that land and is incapable of existence separate and apart from the particular land to which it is annexed."); *Yaali, Ltd. v. Barnes & Noble, Inc.,* 269 Ga. 695, 695–96, 506 S.E.2d 116, 117–118 (1998) ("The creation of an easement appurtenant requires that the grantee of the easement own the dominant estate, the land benefitted by the easement. This principle is known as 'unity of title.' Without unity of title, no easement appurtenant can be created.") (footnote omitted); *Shingleton v. State,* 260 N.C. 451, 454, 133 S.E.2d 183, 185–186 (1963) ("An appurtenant easement is one which is attached to and passes with the dominant tenement as an appurtenance thereof; it is owned in connection with other real estate and as an incident to such ownership.... An easement appurtenant is incapable of existence apart from the particular land to which it is annexed, it exists only if the same person has title to the easement and the dominant estate; it must bear some relation to the use of the dominant estate, and it must agree in nature and quality to the thing to which it is claimed to be appurtenant. An easement appurtenant is incident to an estate, inheres in the land, concerns the premises, pertains to its enjoyment, and passes with the transfer of the title to the land, including transfer by descent."); *Holland v. Flanagan,* 139 W.Va. 884, 81 S.E.2d 908 (1954) ("An easement appurtenant is defined

260 N.C. 451, 454, 133 S.E.2d 183, 185 (1963). An easement in gross is not assignable and applies to specific people and not to guests or assignees. *Beckstead v. Price,* 146 Idaho 57, 65, 190 P.3d 876, 884 (2008).

 Many jurisdictions, including this Court, have shown a strong constructional preference for finding easements to be appurtenant rather than in gross. In Syllabus Point 3 of *Post v. Bailey,* 110 W.Va. 504, 159 S.E. 524 (1931), this Court stated: "An easement will not be presumed to be in gross when it can fairly be construed to be appurtenant." [5]

 This Court has previously addressed how to determine whether an easement is appurtenant or in gross. We said in Syllabus Point 2 of *Post v. Bailey, supra:*

Whether an easement is appurtenant or in gross is to be determined by the intent of the parties as gathered from the language employed, considered in the light of surrounding circumstances.

The circuit court below found that the T.M. Newman easement was not an easement ap-

as: 'An "incorporeal right" which is attached to and belongs with some greater and superior right or something annexed to another thing more worthy and which passes as incident to it and is incapable of existence separate and apart from the particular land to which it is annexed.' Black's Law Dictionary, Fourth Edition, page 599."). *See also* 7 *Thompson on Real Property* 60.06(f)(1) (Thomas ed. 1994) ("The property burdened by an easement appurtenant is know as the servient estate, and the property benefitted by the easement is the dominant estate.").

5. "At common law, easements in gross were strongly disfavored because they were viewed as interfering with the free use of land. Thus, the common law rule of long standing is that an easement is 'never presumed to be in gross when it [can] fairly be construed to be appurtenant to land.' " *U.S. v. Blackman,* 270 Va. at 77, 613 S.E.2d at 446, *quoting French v. Williams,* 82 Va. 462, 468, 4 S.E. 591, 594 (1887). For examples of other courts applying the constructional preference for easements appurtenant, *see Luevano v. Group One,* 108 N.M. 774, 779 P.2d 552, 555 (1989); *Continental Baking Co. v. Katz,* 68 Cal.2d 512, 439 P.2d 889, 67 Cal.Rptr. 761 (1968); *Martin v. Music,* 254 S.W.2d 701 (Ky.1953); *Todd v. Nobach,* 368 Mich. 544, 118 N.W.2d 402 (1962); *Johnson County v. Weber,* 160 Neb. 432, 70 N.W.2d 440 (1955).

purtenant because T.M. Newman had no ownership interest in a dominant estate. T.M. Newman lived on the Newman property, but his mother, Ida Newman, owned the property. Additionally, the T.M. Newman easement did not have a terminus at, and did not touch, the Newman property. Rather, the T.M. Newman easement ran over the property and driveway currently owned by the Michels and connected to the Old Road, which runs north into the Newman property. With no ownership interest in the property and an easement that did not connect the dominant and servient estates, the circuit court concluded that the T.M. Newman easement was an easement in gross.

The language used in T.M. Newman's agreement with the Elwells supports the circuit court's conclusion that the T.M. Newman easement was in gross. The document states that the agreement is made between Gladys Marie Short Elwell and Cyril John Elwell, parties of the first part, and T.M. Newman, party of the second part. The agreement also explicitly states that its terms are limited to the Elwells and to T.M. Newman:

> It is understood and agreed between the parties hereto that said 20 foot right of way or road is to be used and enjoyed for road purposes only, by the parties of the first part [the Elwells] and the second part [T.M. Newman] respectively, and is not to be considered or treated as a public road.

 The Newman appellants' argument that the T.M. Newman easement is an easement appurtenant fails for three reasons. First, T.M. Newman had no ownership interest in the Newman family property. A baseline requirement for one to have an easement appurtenant is that the holder of the easement must own the dominant estate which the easement serves. Second, the T.M. Newman easement does not connect to the Newman property, rather it runs over the Michels' property and connects with the Old Road that leads north to the Newman property. Therefore, the Newman property cannot be considered a dominant estate. Final-

ly, the language of the agreement states that the 20–foot road easement is to be used only by T.M. Newman and the Elwells. This agreement, which names T.M. Newman personally, is directly in line with the definition of an easement in gross which "does not belong to any person by virtue of ownership of estate in other land but is mere personal interest in or right to use land of another; it is purely personal and usually ends with death of grantee." *Ratino, supra,* 188 W.Va. at 411, 424 S.E.2d at 756.

For these reasons we affirm the circuit court's granting of summary judgment to the Michels and finding that the T.M. Newman easement was in gross and terminated upon T.M. Newman's death in 1946.

### B. *Prescriptive Easement or Permissive Use*

 Following the circuit court's ruling that the T.M. Newman easement was in gross, the parties proceeded to trial on the sole issue of whether the Newmans had established a prescriptive easement across the Michels' property. The circuit court found that there was no clear and convincing evidence that the post–1946 use of the T.M. Newman easement and subsequent use of the spur that developed around the Michels' residence was adverse to, or objected to, by the Michels or their predecessors in interest, the Fletchers. The circuit court therefore ruled that the Newmans failed to establish a claim that was sufficient to create a prescriptive easement over the Michels' property.

 Prescriptive easements are often described as being similar in nature to the doctrine of adverse possession.[6] The main distinction between these concepts is that an adverse possession claimant occupies or possesses the disputed land, whereas one seeking a prescriptive easement makes some easement-like limited use of the disputed land.

 In *Town of Paden City v. Felton,* 136 W.Va. 127, 66 S.E.2d 280 (1951), this Court addressed what a party must show in

---

**6.** *See* Saxe, *When "Comprehensive" Prescriptive Easements Overlap Adverse Possession: Shifting Theories of "Use" and "Possession."* 33 B.C. Envtl. Aff. L. Rev. 175 (2006) (contrasting ele-

ments required for adverse possession and prescriptive easements, and noting that the doctrines are "quite similar.").

order to establish a prescriptive easement, stating at Syllabus Point 1:

> To establish an easement by prescription there must be continued and uninterrupted use or enjoyment for at least ten years, identity of the thing enjoyed, and a claim of right adverse to the owner of the land, known to and acquiesced in by him; but if the use is by permission of the owner, an easement is not created by such use.[7]

 All of the elements of prescriptive use, including the fact that the use relied upon was adverse, must appear by clear and convincing evidence. *See* Syllabus Point 2, *Beckley Nat. Exchange Bank v. Lilly,* 116 W.Va. 608, 182 S.E. 767 (1935).

 In order to make a valid claim for a prescriptive easement over the Michels' property, the Newman appellants had the burden to show, by clear and convincing evidence, that their use of the Michels' driveway was (1) continuous, open and uninterrupted; (2) for a period of at least 10 years; (3) adverse to the owner of the land, known and acquiesced in by him or her; and (4) without the owners permission.[8]

In *Veach v. Day,* 172 W.Va. 276, 304 S.E.2d 860 (1983), this Court stated that the continuous requirement that is necessary to support the establishment of a prescriptive easement must constitute more than occasional or sporadic use of the right of way. The Court in *Veach* examined a Texas case, *Fannin v. Somervell County,* 450 S.W.2d 933 (Tex.Civ.App.1970), in which a group of people who occasionally used a private parcel along a river for picnicking, camping, swimming and fishing, failed to demonstrate that their use was sufficiently continuous to support a prescriptive easement. Another case relied on in *Veach, Stupnicki v. Southern New York Fish & Game Ass'n,* 41 Misc.2d 266, 244 N.Y.S.2d 558 (N.Y.Sup.Ct.1962), held that occasional or sporadic use of an abandoned road over an owner's land would not be sufficient to create a prescriptive easement.[9]

The testimony at trial showed that the Newman appellants used the T.M. Newman easement continuously for a 10–year period. There was testimony that the Newmans used portions of the T.M. Newman easement and the spur between 1963 and 1975. The Newman appellants' uncle, Steve Newman, lived on the property from the early 1960's through 1973. During this period, Kenneth Newman accessed the property using the spur on a monthly basis to assist his uncle with various chores. Kenneth Newman also testified that he visited the property two or three times a week during farming season

---

7. Syllabus Point 2 of *Post v. Wallace,* 119 W.Va. 132, 192 S.E. 112 (1937), states the requirement slightly differently:

> The open, continuous and uninterrupted use of a road over the land of another, under *bona fide* claim of right, and without objection from the owner, for a period of ten years, creates in the user of such road a right by prescription to the continued use thereof.

*See also Norman v. Belcher,* 180 W.Va. 581, 378 S.E.2d 446 (1989); *Foster v. Sumner,* 180 W.Va. 617, 378 S.E.2d 659 (1989); *Crane v. Hayes,* 187 W.Va. 198, 417 S.E.2d 117 (1992); *Jamison v. Waldeck United Methodist Church,* 191 W.Va. 288, 445 S.E.2d 229 (1994); *Carr v. Constable,* 196 W.Va. 276, 470 S.E.2d 408 (1996); *Wheeling Stamping Co. v. Warwood Land Co.,* 186 W.Va. 255, 412 S.E.2d 253 (1991), *Moran v. Edman,* 194 W.Va. 342, 460 S.E.2d 477 (1995).

8. Though not an issue in this case, exclusivity is another element that is sometimes required for one to obtain a prescriptive easement. " 'Exclusive use', however, does not mean that no one has used the way except the claimant of the easement; it means that his right to do so does not depend upon a similar right in others. In order to establish an independent prescriptive right, the individual user must perform some act to the knowledge of the servient owner which clearly indicates his individual claim of right." *Town of Paden City,* 136 W.Va. at 137, 66 S.E.2d at 286–87 (citation omitted). *See also,* Syllabus Point 3, *Hall v. Backus,* 92 W.Va. 155, 114 S.E. 449 (1922) ("Use of an open way in common with the owner of the land on which it is and the public in general is presumptively permissive, and not exercised under a claim of right, in the absence of proof of some act on the part of the person so using it, or circumstance under which he used it, showing a claim of exclusive or peculiar right in him distinct from that of the general public.").

9. For other cases discussing the "continuous" requirement, *see Turner v. Anderson,* 130 Colo. 275, 274 P.2d 972 (1954); *Trexler v. Lutz,* 180 Pa.Super. 24, 118 A.2d 210 (1955); *Uliasz v. Gillette,* 357 Mass. 96, 256 N.E.2d 290 (1970).

between 1959 and 1964.[10] Marty Newman testified that he remembers family picnics during the early 1960's, farming several large gardens on the property during the late 1960's, and accompanying his father on trips to the farm during the late 1960's and early 1970's. Based on this testimony, the Newmans' use of the spur around the Michels' residence between 1963 and 1975 was sufficient to establish that the use was continuous for a period of at least 10 years.

However, the Newman appellants also had to demonstrate that their use of the easement was adverse to the Michels and their predecessors in interest, the Fletchers. The circuit court found that the Newmans' use of the driveway and spur was neither adverse to, nor objected to during the time the Fletchers owned the property (1947–1973). The circuit court found that the Newmans' use began permissively with the granting of the T.M. Newman easement in 1940. Even though the T.M. Newman easement expired upon T.M. Newman's death in 1946, the Newmans' use of this easement and the spur which they later developed were not objected to by the Fletchers. The circuit court concluded that the Newmans' use of the property began permissively and that no adverse or hostile event occurred after the inception of this use which would convert it from being permissive into being prescriptive.

▮ The circuit court's analysis of why the Newmans' use of the easement was permissive rather than prescriptive was guided by Syllabus Point 2 of *Faulkner v. Thorn*, 122 W.Va. 323, 9 S.E.2d 140 (1940), which states:

The use of a way over the land of another, permissive in its inception, will not create an easement by prescription no matter how long the use may be continued, unless the licensee, to the knowledge of the licensor, renounces the permission and claims the use as his own right, and thereafter uses the way under his adverse claim openly, continuously and uninterruptedly, for the prescriptive period.[11]

Four people testified on behalf of the Newman appellants at the trial below. Along with the Appellants, Marty and Kenneth Newman, the Newmans' sister, Margie Phillips and their aunt, Myrtle Belcher, all testified that they used a portion of the T.M. Newman easement and the spur around the residence openly. All four witnesses state that they did not seek permission to use this route, nor was access to it denied by the Fletchers. The testimony reveals that the Fletchers were aware of the Newmans' use of the easement, were on good terms with the Newman family, and that the issue of whether the Newmans had an easement across the Fletcher's property was never discussed.[12]

The Fletchers' lack of explicit permission in the face of the Newmans' use of their property is not sufficient to satisfy the adverse requirement. *Faulkner* and *Town of Paden City* require one to make a decisive act manifesting an adverse or hostile claim. The testimony showed no such hostile act occurred during the time the Fletchers owned the property. Rather, the Newmans' use of a portion of the T.M. Newman ease-

---

**10.** *See Perry v. Williams*, 84 N.C.App. 527, 530, 353 S.E.2d 226, 228 (1987) (use of roadway during farming season constituted continuous enjoyment).

**11.** The circuit court also cited *Town of Paden City, supra*, which stated that no matter when the use began or how long it lasts, a prescriptive easement will not be created if it began by permission of the owner of the servient estate, unless the person claiming the easement makes a decisive act manifesting an adverse or hostile claim. 136 W.Va. 127, 137–38, 66 S.E.2d 280, 287 (1951).

**12.** Appellant Marty Newman, when asked whether the Fletchers ever refused him access to the

spur, testified: "I never heard any refusal. I never heard anything, any recognition along that line, as permission granted either."

Appellant Kenneth Dale Newman testified that his father Hugh Newman had a good relationship with Gary Fletcher, stating: "Yes, and he was always glad to see dad and they always had a good conversation."

The Newman appellants sister, Margie Phillips, testified that Gary Fletcher and her father, Hugh Newman were friendly and spoke to each other from time to time. When asked whether Gary Fletcher gave her father express permission to use the T.M. Newman easement, Margie Phillips stated: "That was never a question." When asked whether Gary Fletcher ever denied the Newmans access to use it, she responded: "No."

ment and the spur continued routinely throughout the time the Fletchers owned the property, and at no time did the Newmans and Fletchers have any disagreement over this use.

While the Newmans' relationship with the Michels was not as friendly as it had been with the Fletchers, the testimony at trial was that the Michels allowed the Newmans to use their driveway, park near their residence and access the property by foot. Both Kenneth and Marty Newman testified that for the last 30 years, they parked by the side of the Michel residence and walked up to their property.[13] James Michel testified that prior to the day of the trial, the Newmans had his permission to use his driveway and park by the side of his house. The testimony does not reveal any adverse or hostile acts on the part of the Newmans since the Michels bought the property in 1973 which would convert their use from being permissive into being prescriptive. This lack of an adverse or hostile act is fatal to the Newmans' claim that they established a prescriptive easement over the Michels' property.

We therefore affirm the circuit court's finding that the Newmans failed to meet their burden of showing, by clear and convincing evidence, that they established a prescriptive easement over the Michels' property.[14]

## IV.

### Conclusion

For the foregoing reasons, we affirm the circuit court's orders.

Affirmed.

---

**13.** Appellant Marty Newman testified that in the last 30 years, he has parked at the base of the hill and walked up to the property. He testified that James Michel never gave him permission to park there, but also did not ask him to leave when he accessed the property.

James Michel testified that since 1973, the Newmans have parked at the base of the spur, by his side yard, and walked up the hill.

**14.** The Newmans concede that the necessity for the easement they seek arose in approximately 1977 when a portion of County Road 26 near the Old Road was closed due to road deterioration and high water. The Newmans argue that with the closing of this road, the best access to their property is by using the Michels' driveway and the spur around the Michels' residence.

County Road 26 is a public road. Both James Michel and the Newman appellants testified that there is a "Road Closed" sign on the entrance point of this road beyond the end of the Michels' driveway. There was no evidence presented, however, that this sign was placed there by a county or state official, or that the formal proce-

dure for closing an unused road, street, or travel way, as described in *W.Va.Code*, 7–1–3h [1967], occurred with regard to County Road 26. *W.Va. Code*, 7–1–3h allows a landowner to submit an application to a county commission to close a road, street, or other travel way that abuts the landowner's property. If the county commission concludes that the use and rights of no person or persons in such a road or travel way will be impaired, the commission may enter an order closing the road.

During oral argument in this matter, counsel for the Newman appellants was asked whether the County Road 26 access point, if not fenced off by the Michels, would provide his clients with a sufficient entryway onto their property. Counsel responded by stating "With that access, we'll take it." Counsel for the Michels then told the Court that the fence which James Michel had erected in front of County Road 26 is no longer there and stated that the Michels do not contest that the Newmans have the right to access their property by traveling on the remains of County Road 26 to the Old Road, and then traversing the Old Road north across the Michels' property onto the Newmans' property.