Rel: June 27, 2025

**Notice:** This opinion is subject to formal revision before publication in the advance sheets of **Southern Reporter**. Readers are requested to notify the **Reporter of Decisions**, Alabama Appellate Courts, 300 Dexter Avenue, Montgomery, Alabama 36104-3741 ((334) 229-0650), of any typographical or other errors, in order that corrections may be made before the opinion is published in **Southern Reporter**.

# ALABAMA COURT OF CIVIL APPEALS

## OCTOBER TERM, 2024-2025

———————————————

### CL-2023-0533

———————————————

### James W. Hynes

### v.

### Milton B. Middleton, Margaret W. Middleton, Ted L. Calhoun, Elizabeth R. Calhoun, Brian Gilbert, and Jacalyn Gilbert

### Appeal from Tallapoosa Circuit Court
### (CV-22-900026)

HANSON, Judge.

This appeal concerns boat-slip license agreements and a pedestrian easement for ingress and egress claimed by owners of nonwaterfront property and their access to certain boat slips on Lake Martin in Tallapoosa County.

## Facts and Procedural History

On May 24, 2022, James W. Hynes filed a complaint in the Tallapoosa Circuit Court ("the trial court") that named as defendants Milton B. Middleton, Margaret W. Middleton, Ted L. Calhoun, Elizabeth R. Calhoun, Brian Gilbert, and Jacalyn Gilbert ("the defendants"). Hynes asserted that he owned two lakefront parcels of land at "the Preserve at Stoney Ridge" ("the Preserve"), a property development at Lake Martin. Hynes asserted that a dock containing three boat slips was adjacent to his property and that a pedestrian easement across his property had been recorded in the Tallapoosa Probate Court ("the probate court"). He alleged that the defendants did not have the right to access the dock and boat slips attached to his property. As relief, Hynes requested a judgment (1) declaring the "rights, scope and bounds of interest held by the parties" as to the dock containing the boat slips, (2) ejecting the defendants from his property with regard to the pedestrian easement to access the dock containing the boat slips, and (3) barring the defendants from trespassing upon his property for access or use of the dock containing the boat slips. Hynes requested also compensatory and punitive damages.

On June 14, 2022, the defendants filed an answer to the complaint and a counterclaim. In their counterclaim, the defendants alleged that Hynes had interfered with their use of the dock containing the boat slips, and they asserted a claim of intentional infliction of emotional distress. The defendants sought compensatory and punitive damages.

On August 26, 2022, the trial court entered a temporary order (1) permitting the defendants' continued use of the three boat slips attached to Hynes's property, (2) allowing the defendants the right to park an additional boat at either end of the dock containing the three boat slips, (3) ordering the parties not to "annoy, harass or alarm" any opposing party, and (4) ordering the parties not to hamper, frustrate, or interfere with any party's ability to use the easement or any party's ability to use and access the dock. The trial court stated that it would set the matter for trial following the completion of discovery.

At the trial on April 19, 2023, the following evidence was presented. On October 21, 2014, Stoney Ridge, LLC, a Georgia limited-liability company ("Stoney Ridge GA"), transferred certain lots at the Preserve to Rodan Land Co., LLC ("Rodan Land"), an Alabama limited-liability company. The transferred lots included the two lots subsequently

purchased by Hynes (lots D and D-1) and the lots subsequently purchased by the Calhouns (lot 57) and the Gilberts (lot 47). Lot 41, subsequently purchased by the Middletons, was not included in the October 21, 2014, transfer. According to Daniel Holland, the majority member of Rodan Land, Stoney Ridge GA retained ownership of lot 41 at the Preserve in order to retain certain development rights peculiar to a developer, including control of the development's architectural-review board. Holland testified that, at some point, Holland Homes, LLC, an Alabama limited-liability company, acquired lot 41. It appears that, at some point, Rodan Land transferred its interests in lots 47 and 57 to Holland Homes.

On October 1, 2018, Holland Homes recorded a warranty deed in the probate court transferring its interest in lot 41 to the Middletons. On January 2, 2019, Holland Homes recorded a warranty deed in the probate court transferring its interest in lot 47 to the Gilberts. On June 4, 2020, Holland Homes recorded a warranty deed in the probate court transferring its interest in lot 57 to the Calhouns.

On June 29, 2020, "Daniel Holland (Rodan Land Co., LLC)" entered into a "Nontransferable Lakeshore Permit (Non-Commercial -- Multiple Single Type Family Dwellings)" with Alabama Power Company

4

("Alabama Power") to "make certain uses of and engage in certain activities" on Lake Martin and to add a structure to the shoreline of Lake Martin. The permit provided that Holland could add a new 100-foot boardwalk across lot D, with no change to the existing dock containing the three boat slips attached to lot D.

On July 15, 2020, Rodan Land recorded in the probate court an instrument granting an easement for pedestrian ingress and egress on lot D in favor of Stoney Ridge LLC, an Alabama limited-liability company (hereby referred to as "Stoney Ridge AL"); that instrument was dated May 28, 2020. The easement provided for a "ten foot (10') permanent and perpetual easement, running with the land, for pedestrian ingress and egress over and across the ten foot (10') strip of land along the southern lot line of Lot D." The easement instrument stated:

> "Whereas, Rodan Land Co., LLC, an Alabama limited liability company (hereinafter referred to as 'Grantor') is the owner of that certain real property located in Tallapoosa County, Alabama more particularly described as Lot D, The Preserve at Stony [sic] Ridge, as the same is set forth on subdivision plat recorded in Plat Book 10 at Page 54 and amended in Plat Book 11 at Page 14, all in the Office of the Judge of Probate of Tallapoosa County, Alabama ('hereinafter referred to as ' Lot D'); and

> "Whereas, Stoney Ridge, LLC, an Alabama limited liability company (hereinafter referred to as 'Grantee') has

5

requested from Grantor, and Grantor is willing to grant unto Grantee, a ten foot (10') permanent and perpetual easement, running with the land, for pedestrian ingress and egress over and across the ten foot (10') strip of land along the southern lot line of Lot D (hereinafter referred to as the 'Easement Area').

"Now Therefore, in consideration of one dollar ($1.00) and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Grantor does hereby grant and convey to Grantee, and its successors and assigns, a nonexclusive easement for pedestrian ingress and egress over and across the Easement Area.

"The easement, rights and privileges herein granted shall be perpetual and shall run with the land.

"Grantor covenants and agrees for itself, its successors and assigns not to obstruct, impede, or interfere with Grantee's reasonable use of the Easement Area.

"Grantee shall be responsible for all costs of repair for any damage, whether intentional or negligent, caused by Grantee, its guests, invitees, heirs and assign, to the Easement Area.

"Grantee assumes all risk of personal injury or death or damage, destruction or loss of property claimed by any person, association or other entity arising out the use of the easement by Grantee, its successors and assigns and their respective invitees and licensees, and Grantee agrees to hold harmless Grantor, its successors and assigns, from and against all claims, demands, liabilities, damages and defenses (including, without limitation, attorneys' fees and other legal expenses) arising from such use of the easement by Grantee, its successors and assigns and their respective invitees and licensees.

"In Witness Whereof, the Grantor has executed this Easement for Pedestrian Ingress and Egress as of the 28th day of May, 2020.

"GRANTOR:

"RODAN LAND CO., LLC

"By: Holland Commercial, Inc., Sole Member

"/s/Daniel Holland

"By: Daniel Holland

"Its: President"

On July 14, 2020, Rodan Land transferred its interest in lots D and D-1 to Holland Homes. On July 31, 2020, Stoney Ridge AL recorded in the probate court, a boat-slip license agreement between Stoney Ridge AL and the Gilberts, the owners of lot 47. The boat-slip license agreement was dated June 1, 2020, and provided as follows:

"This boat slip license agreement ('the Agreement') is made by and between Stoney Ridge LLC, an Alabama limited liability company ('Stoney Ridge') and Jacalyn and Brian Gilbert (collectively the 'Owner') as of the 1st day of June 2020.

"RECITALS

"WHEREAS, Rodan Land, LLC is the owner of Lot D, The Preserve at Stoney Ridge (the 'Development'); and

7

"WHEREAS, there is an existing dock (the 'Dock') attached to Lot D containing three (3) slips (each, a 'Slip'), which are licensed to Stoney Ridge and are subject to the rules and regulations of Alabama Power; and

"WHEREAS, Rodan Land, LLC has granted to Stoney Ridge a ten-foot (10') pedestrian access easement over Lot D for the purpose of access to the Dock and Slips; and

"WHEREAS, Owner is the owner of Lot 47 and Stoney Ridge desires to grant a license for the use of one of the Slips to Owner, for the exclusive use of Owner.

"NOW THEREFORE, for good and valuable consideration, the sufficiency of which is hereby acknowledged, Stoney Ridge and Owner hereby agree as follows:

"1. Incorporation of Recitals. The recitals set forth above are incorporated herein by reference as if fully set out herein.

"2. Lot Ownership. Owner is the owner of Lot 47 of the Development (the 'Lot').

"3. Slip License. Subject to the terms and conditions as hereafter set forth, Stoney Ridge does hereby assign to Owner a license to use Slip B as shown on the drawing attached hereto as Exhibit A and incorporated by reference herein.

"4. Repair and Maintenance. The Dock and Slips shall be maintained by the owners of Lots 41, 47, and 57 (collectively, the 'Boat Slip Licensees'), and each of the Slip Licensees each agree to share in the costs of repair and maintenance of the Dock, as well as each Slip, as may be required from time to time.

"5. License Contingencies. This license is contingent upon:

"a. Owner's ownership of the Lot.

"b. Owner's adherence to this Agreement.

"c. The continued permission of Alabama Power Company to maintain the Dock and Slip.

"6. Failure of License Contingency. In the event that any of the contingencies described in paragraph 5 above are not satisfied, the license herein described shall be revoked.

"7. Owner Covenant. During the term of this Agreement, Owner agrees:

"a. Owner shall not assign or otherwise transfer Owner's license as described in this Agreement for the use of the Slip for so long as Owner is the owner of the Lot.

"b. Owner shall not allow the use of the Slip for dockage of a boat or vessel that is not owned by Owner.

"c. Owner shall not allow for the discharge of any hazardous materials or substances into Lake Martin while using the boat dock or Slip.

"d. Owner shall not cause damage to the Dock or Slip.

"e. Owner shall not leave trash or garbage on the Dock or Slip.

"f. Owner shall not store any personal property on the Dock.

"g. Owner shall not access the Slip by land by means other than by foot.

"h. Owner shall not engage in conduct or activities on the Dock or allow any guest of Owner to engage in conduct or activities on the Dock that would create a nuisance to any owner of the Development.

"i. Owner shall repair any and all damage to the Dock or Slip caused by Owner.

"j. Owner shall pay any taxes assessed against the Slip.

"k. Owner shall be responsible for the safe condition and operation of any watercraft used by Owner.

"l. Owner shall assume all responsibility and Indemnify and hold harmless the other Boat Slip Licensees from any loss caused by the negligent acts of Owner.

"m. The Dock and each Slip shall only be used for ingress and egress of boats, and neither Owner, nor any guest of Owner, [shall] loiter, use the Dock for congregating, or use the dock for swimming or sunbathing.

"n. Owner agrees to share in the costs of repair and maintenance of the Dock and Slips with the other Boat Slip Licensees.

"8. <u>Breach of Owner Covenant</u>. In the event that Owner breaches any of the covenants described in paragraph 7 above, any of the other Boat Slip Licensees may give notice to Owner of the same, and Owner shall have thirty (30) days to cure such breach. In the event that Owner should not cure such breach within thirty (30) days of notice from said Boat Slip Licensee, said Boat Slip Licensee may file suit against Owner

10

for either injunctive relief or damages, whichever is appropriate, incurred because of said breach. In the event that a Boat Slip Licensee should file suit and prevails on said suit, Owner shall pay to the prevailing Boat Slip Licensee the reasonable attorney's fees and court costs incurred by Boat Slip Licensee for such suit.

"9. <u>Transfer and Assignment</u>. Owner shall assign Owner's rights under this license to any future owner of the Lot in the event that Owner transfers the Lot, and shall require that any assignee of Owner's rights under this license execute an acknowledgement of the terms and conditions of this Agreement.

"10. <u>Binding Effect</u>. This Agreement shall run with the Lot, and shall be binding on the parties hereto and their respective heirs, personal representatives, successors, and assigns.

"11. <u>Governing Law</u>. This Agreement and all questions arising hereunder shall be construed and interpreted according to the laws of the State of Alabama.

"12. <u>Headings</u>. The headings herein have been inserted as a matter of convenience for reference only and shall not control or affect the meaning or construction of any of the terms and provisions hereof.

"<u>STONEY RIDGE</u>

"STONEY RIDGE, LLC

"By: RODAN LAND CO., LLC, Sole Member

"By: Holland Commercial, Inc., Sole Member

"<u>/s/Daniel Holland</u>

"By: Daniel Holland

"Its: President"

On August 10, 2020, Stoney Ridge AL recorded in the probate court a boat-slip license agreement between Stoney Ridge AL and the Middletons, the owners of lot 41. The agreement was dated June 1, 2020, and contained essentially the same terms as the agreement between Stoney Ridge AL and the Gilberts. Likewise, on August 21, 2020, Stoney Ridge AL recorded in the probate court a boat-slip license agreement between Stoney Ridge AL and the Calhouns, the owners of lot 57. The agreement was dated May 29, 2020, and contained essentially the same terms as the other boat-slip license agreements recorded by Stoney Ridge AL.

On January 27, 2021, Holland Homes sold its interest in lots D and D-1 to Hynes pursuant to a warranty deed. The warranty deed provided that the conveyance was subject to any and "all easements, covenants, and rights-of-way of record." On July 22, 2021, Alabama Power executed a "Nontransferable Lakeshore Permit (Non-Commercial -- Multiple Single Type Family Dwellings)" naming Hynes as the owner of lot D, which permit was substantially similar to the permit Alabama Power had

issued to "Daniel Holland (Rodan Land Co., LLC)" on June 29, 2020, when Rodan Land had owned lot D.

Holland testified regarding the business entities and transactions involved with the Preserve. Holland stated that he was the managing member and sole member of Holland Homes. Holland testified that he owned 65% of the shares in Holland Commercial, Inc., and that Chris Seals owned the other 35%. Holland stated that he was the sole remaining member of Rodan Land. Holland said that he had been affiliated with Stoney Ridge AL but that he was not sure if that limited-liability company was "still active." He acknowledged that a document from the Alabama Secretary of State indicated that Stoney Ridge AL was still active.

Holland stated that Rodan Land had acquired properties from Stoney Ridge GA in 2014. He explained that it was common practice for him, as a property developer, to create a limited-liability company whenever he purchased a large number of lots from another developer. Holland and Robert Melvin were the members of Rodan Land in 2014 when Rodan Land purchased lots from Stoney Ridge GA. Holland testified that Rodan Land had purchased several lots in one transaction,

13

including lots 47, 57, D, and D-1. Holland explained that he had acquired lot 41 in a subsequent transaction in order to retain certain rights the original developer had had, such as control of the development's architectural-review board. Holland stated that Rodan Land transferred lots D and D-1 to Holland Homes on July 14, 2020. He stated that Holland Homes was his "home building company." Holland stated that, when Rodan Land purchased lot D, lot D had featured a concrete parking pad, a retaining wall, and an area to access common docks for the entire community. Holland admitted that there were no documents indicating that the docks containing the boat slips attached to lot D had been dedicated for the use of the entire community.

Holland testified that a pedestrian easement across lot D had been recorded on July 15, 2020. Holland said that the three boat slips had been attached to lot D when Rodan Land had purchased the lot in 2014. Holland stated that the grantor of the pedestrian easement was Rodan Land and that the grantee was Stoney Ridge AL. Holland admitted that the pedestrian easement did not reference the boat slips or access thereto. Holland acknowledged that Holland Homes had sold lots 41, 47, and 57 to the Middletons, the Gilberts, and the Calhouns, respectively, and that

14

it was not Stoney Ridge AL that had sold the lots to the defendants. He also acknowledged that lots 41, 47, and 57 had been transferred before the execution of the pedestrian-easement instrument. Holland stated that he believed that the original developer had installed common docks for the community, but, again, he admitted that there were no documents to support the existence of common docks. Holland stated that he had discussed the use of the boat slips with the Middletons, the Calhouns, and the Gilberts. Holland stated that he had originally told them that they would have use of the common docks on a first-come, first-served basis. Holland stated that he had signed a boat-slip license agreement between Stoney Ridge AL and the Middletons on June 1, 2020, which had provided that the Middletons could use the slips. Holland acknowledged that the recitals in that boat-slip license agreement provided that Rodan Land had granted a pedestrian easement over lot D to Stoney Ridge AL for the purpose of accessing the dock and boat slips.

Holland testified that Rodan Land had obtained a permit from Alabama Power to add a new boardwalk for lot D. Holland said that he believed that there was an existing permit allowing for the dock containing three boat slips. Holland admitted that he had submitted the

15

plan to add the new boardwalk to Alabama Power and that the plan had indicated that the three boat slips were existing structures. When asked about the plans for lot D, Holland testified that, after Rodan Land had conveyed lot D to Holland Homes on July 14, 2020,

> "[t]he plan was to construct the house on lot D. That house had already been designed specifically for that lot by Mr. Tiernan, the previous developer, and get a boardwalk approved for him -- for lot D to have access and have a boat slip, in addition to the existing three boat slips that were there. So that … when someone bought the home, the new structure that was being built on lot D, they would have access. And the easement was recorded so that everyone who had license to access the two existing slips would be able to continue to have that, so on and so forth."

Holland admitted that, before seeking approval for the new boardwalk from Alabama Power, he had approached Alabama Power seeking to add additional boat slips to the three boat slips attached to lot D. Holland stated that Alabama Power would not approve his request. Holland said that he had asked Alabama Power about adding boat slips to the existing three boat slips before he executed the pedestrian-easement instrument and the boat-slip license agreements.

Holland acknowledged that the real-estate contract between Holland Homes and Hynes regarding lot D (dated September 2, 2020) had a survey report attached to it that was dated July 8, 2020, and that

16

there was no reference in that report to the pedestrian-easement instrument dated May 28, 2020. Holland testified that the deed from Holland Homes to Hynes dated January 27, 2021, and signed on January 29, 2021, had stated that the pedestrian-easement instrument dated May 28, 2020, had been filed in the probate court. Holland testified that the original developer's intent was for multiple families to be able to park on the concrete pad located on lot D and have use of the boat slips attached to lot D through a homeowners' association. Holland admitted that no documents connected the boat slips to multifamily use.

Holland acknowledged that Hynes had asked, though an email message, to eliminate the pedestrian easement and that Holland had told Hynes that he could not do that. When asked whether he had been transparent with Hynes regarding the three boat slips attached to lot D, Holland responded that his employees had been transparent with regard to what interests Hynes was getting with lot D. Holland was asked:

> "Q. Do you have a piece of paper or a document on behalf of Rodan Land Company, Holland Homes, Stoney Ridge where you disclosed to … Hynes that lot D is going to have three boat slips stuck to it that I've granted licenses to three other people that own inland lots, they are going to use the boat slip?
>
> "A. We do not have any legal document."

17

Holland stated that the email messages from his employees had explained to Hynes that the boat slips belonged to others. When asked whether he had told Alabama Power that Hynes could be the new permittee of the three boat slips, Holland responded that he did not recall having had such a conversation.

Holland testified that when Holland Homes had sold lots 41, 47, and 57, the defendants were intended to have access to the lake. He said that, after they had purchased the lots, the defendants were each given a boat-slip license. Holland explained that, before the building of a house on lot D, people had used the concrete pad on lot D to park and then walk to the boat slips. Holland admitted that Hynes had named him as a defendant in a separate lawsuit regarding the pedestrian easement. Holland testified that he was willing to extend the boardwalk so that no one would need to use the pedestrian easement on lot D to access the boat slips. Holland said lot D had been transferred from one business entity to another for the construction process. Holland said that houses on the water are more valuable than nonwaterfront houses. Holland admitted that the wooden walkway and steps intended to be placed on the pedestrian easement across lot D had encroached upon Hynes's property.

18

Eva Middlebrooks, an employee of the Tallapoosa County Revenue Commission, testified that the Middletons, the Calhouns, and the Gilberts were paying ad valorem taxes to the county with respect to the dock and boat slips. She stated that the taxes had been added in August 2020. Middlebrooks testified that Hynes was not assessed any taxes for the dock and boat slips.

Rhett Hanks, an employee of Alabama Power, identified a permit from Alabama Power naming Rodan Land as the permittee of a nontransferable lakeshore permit for "non-commercial, multiple single type family dwellings" on Lake Martin. The permit was dated June 29, 2020, and allowed for the building of a boardwalk near the three boat slips. Hanks testified that, in order to determine whether a requested permit should be issued, Alabama Power would make sure that the proposed permit was within Alabama Power's guidelines. Hanks stated that the guidelines for a dock included considering factors such as the width of the lot, the width of the slough, how far the dock extended into the water, and how close the dock would be to neighboring property. Hanks testified that additional boats could be moored along the boardwalk. Hanks stated that a maximum of 10 boats could be parked

19

in the boat slips and along the boardwalk. Hanks explained that Hynes could place cleats on the boardwalk and park a boat there. Hanks identified an email message from Hynes dated June 17, 2021, in which Hynes had requested adding one more slip to the three slips attached to lot D. Hanks could not recall whether Alabama Power had denied Hynes's request at that time. Hanks stated that adding a slip would require another review of Alabama Power's guidelines.

Hanks testified that there were a few feet where the pedestrian easement and the dock did not join perfectly. Hanks believed that Alabama Power would approve extending the boardwalk to connect to the easement to the dock. Hanks testified that, after Hynes had taken ownership of lot D, Hynes had applied to have the previously issued shoreline permit transferred into his name, which application Alabama Power had granted. Hanks stated that Alabama Power wanted the court to decide whether the multi-family lakeshore permit should name Hynes or the parties with the boat-slip license agreements. Hanks admitted that Alabama Power had issued the lakeshore permit to Hynes on July 22, 2021, as the owner of lot D. Hanks stated that Rodan Land had applied for the lakeshore permit to add the boardwalk and that the

permit had been granted to Rodan Land as the owner of lot D. Hanks could not recall whether Rodan Land, as the then owner of lot D, had asked for the permit "in favor of any of the off-water lot owners."

Mitchell Downing, a licensed professional land surveyor, testified that a 10-foot-wide easement existed across the east side of lot D. Downing explained that some of the wooden walkway and steps intended to be located on the pedestrian easement encroached upon lot D.

Hynes testified that he had contacted Lana McCurdy at Holland Homes because he was interested in purchasing property at the Preserve. Hynes testified that when he had first viewed lot D there had been no house on the lot. Hynes acknowledged that he had entered into a contract with Holland Homes to purchase lots D and D-1 on September 3, 2020.

Hynes testified that before the closing on the sale of lots D and D-1 on January 29, 2021, he had seen the boat slips and had thought the slips were part of the property he was purchasing. He said that the empty boat slips had mildew on them and appeared to be old. Hynes testified that he did not receive the warranty deed to his lots for a few weeks after the closing. Because Hynes was living in another state, he did not return to lots D and D-1 until April 2021. At that time, Hynes testified, there

were boats in the boat slips. Hynes stated that he had contacted the probate court about the reference in the warranty deed to an easement. Hynes testified that he had contacted the shoreline-management office of Alabama Power and had asked to add a boat slip to the three existing boat slips. He said that Alabama Power did not approve of the proposed addition. Hynes testified that he had also applied to Alabama Power for a boat slip to be attached to the boardwalk along his property, which application was denied. Hynes testified that he had applied to have the lakeshore permit for the three existing boat slips transferred from Rodan Land, which application was granted.

Hynes testified that the wooden walkway and steps on his property were eroding and unsafe. Hynes testified that he sent an email message to Holland, asking him if he would terminate the pedestrian easement because the walkway was dangerous. Hynes acknowledged that he had been unaware of the boat-slip licenses until he hired a lawyer following the closing. Hynes stated that letters dated September 3, 2021, had been sent to the Gilberts, the Middletons, and the Calhouns, stating that their boat-slip license agreements had been terminated. Hynes testified that he did not see any activity on the boat slips until April 2022.

Hynes explained that, after having talked with the Calhouns, who were using one of the boat slips, he had called law enforcement. No further action was taken because the law-enforcement officers were unable to contact the attorneys for Hynes or the Calhouns. Hynes testified that the Calhouns had used the boat slip in 2022. Hynes testified that the children of the defendants had been walking on his property instead of using the easement. Hynes also explained that the walkway was partially on his property and not on the easement.

On cross-examination, Hynes testified that he had not seen the boat slips in August 2020 when he had viewed the property in person. Hynes admitted that he had asked McCurdy if the property he was purchasing had boat slips or just waterfront access and that McCurdy had responded that the property would have an approximately 100-foot pier -- i.e., the boardwalk -- running along the shoreline. Hynes stated that the walkway that was on his property and on the easement connected to a set of stairs and then to the dock. Hynes admitted that he did not have "multiple single-family dwellings" on lot D.

McCurdy testified that she had been the real-estate agent that had sold the property at issue to Hynes. McCurdy stated that she had known

that the boat slips did not belong exclusively to lot D but could not recall if she had informed Hynes of that fact. McCurdy stated that the head of sales at Holland Homes had informed her that the property had waterfront access.

Milton Middleton testified that he and his wife owned lot 41 and the house located on that lot at the Preserve. Milton testified that he had purchased lot 41 in 2018 and that the pedestrian easement had been created later. Mary Ellen Moore, Hynes's neighbor, testified that she had told Hynes that the dock and boat slips had been used by people who owned nonwaterfront lots. Moore testified that she had communicated with Hanks at Alabama Power regarding the boat slips. William Allen Simmons, another of Hynes's neighbors, testified that he had seen the Middletons, the Calhouns, and the Gilberts using the boat slips. Brian Gilbert testified that he and his wife owned lot 47. He stated that he had performed maintenance, such as power washing, on the boat slips over several years. Ted Calhoun testified that he and his wife owned lot 57 at the Preserve.

The trial court asked the parties for briefs regarding their claims. In his trial brief, Hynes argued essentially that no easement appurtenant

had been created to allow for pedestrian access over lot D because Stoney Ridge AL, as the grantee of the pedestrian easement, never had had an ownership interest in lots 41, 47, or 57 and that, therefore, there existed no dominant estate; Hynes also posited that Stoney Ridge AL never had a property interest in lot D and could not grant a boat-slip license to anyone for use of the boat slips attached to lot D. In their brief, the defendants argued that Hynes was on notice of the pedestrian easement and boat-slip licenses, that the pedestrian easement was valid because it was granted from one property owner to another by express conveyance, and that the boat-slip license agreements were valid.

On June 13, 2023, the trial court entered a judgment that provided, in pertinent part:

> "The facts, largely undisputed, are as follows:
>
> "The Preserve at Stoney Ridge is a lake front community located on the Martin Reservoir in Tallapoosa County, Alabama. The lots relevant to this action were originally obtained by Stoney Ridge, LLC ('Stoney Ridge' a Georgia Limited Liability Company) and later transferred to Rodan Land Co., LLC ('Rodan' an Alabama Limited Liability Company) on October 17, 2014. On May 28, 2020, while still the title owner of Lot D and D-1 of the Preserve at Stoney Ridge, Rodan executed an 'Easement for Pedestrian Ingress and Egress' and properly recorded the same with the Probate Court of Tallapoosa County on July 15, 2020. The easement between Rodan and its sole member Stoney Ridge, specifically

confers a 'non-exclusive easement for pedestrian ingress and egress over and across the Easement Area,' which is defined as 'a ten (10) foot strip of land along the southern lot line of Lot D.' (Plaintiff's Ex. 3). The southern lot line of Lot D extends from Stone House Road to the Martin Reservoir (Plaintiff's Ex. 1).

"On July 14, 2020, Rodan transferred its interest in Lot D and D-1 to Holland Homes, LLC ('Holland Homes' an Alabama Limited Liability Company), subject to 'any and all easements, covenants, and rights-of-way of record in said county affecting said described property.' (See Plaintiff's Ex. 4). Finally, on January 29, 2021, Holland Homes transferred title to Lot D and D-1 to Plaintiff Hynes.

"The deed transferring title of Lot D and D-1 from Holland Homes to the Plaintiff Hynes includes specific language that the lots are being transferred '[s]ubject to that certain Easement for Pedestrian Ingress and Egress dated May 28, 2020, and filed for record in Document Number 343003 in the Office of the Judge of Probate of Tallapoosa County, Alabama.' (Plaintiff's Ex. 5). It is clear to the Court that Plaintiff had legal constructive and actual notice of the easement at the time of closing on Lot D, and the Court finds that the easement is valid and enforceable as to its specific terms, as a 10-foot strip of land on the southern lot line of Lot D which shall be a non-exclusive easement for pedestrian ingress to Martin Reservoir from Stone House Road and egress from Martin Reservoir to Stone House Road.

"Prior to the transfer of Lot D to Holland Homes, Stoney Ridge also executed Boat Slip License Agreements with the Calhouns (Plaintiff's Ex. 8) on May 29, 2020, and with the Middletons and the Gilberts (Plaintiff's Ex. 7 and 10 respectively) on June 1, 2020. The said Agreements were signed by Daniel Holland as President of Holland Commercial, Inc., as the sole member of Rodan, as the sole member of Stoney Ridge. The Agreements were properly

26

recorded with the Probate Court of Tallapoosa County.... Testimony indicates that the 3 boat slips have been in place since at least 2013 or 2014 and have been used by multiple families, including each of the Defendants since their acquisition of their off-lake lots. At the time Plaintiff acquired Lot D, the boat slip was clearly visible from his property and, according to the trial testimony, also visible from the roadway. The Plaintiff was on legal and actual notice of the boat slip. On August 29, 2020, approximately five (5) months prior to his purchase of Lot D, the Plaintiff emailed Realtor Lana McCurdy and specifically asked whether the home would 'have a boat slip or just the waterfront access?' McCurdy responded to the email on the same day and notified the Plaintiff that Lot D would have 'approximately a 100 ft pier that runs along the shoreline.' (Defense Ex. 3) Further, on June 17, 2021, the Plaintiff filed a request with Alabama Power to add a fourth boat slip to the existing structure. Said request was ultimately denied by Alabama Power and this action was subsequently filed.

"The Court is called upon to determine the rights and obligations of the parties as it relates to the easement and boat slip license agreements. Upon consideration of all of the evidence, the Court finds that the Defendants have a valid non-exclusive easement for ingress and egress across the 10-foot strip of land on the southern lot line of Lot D for pedestrian access from Stone House Road to the Martin Reservoir and from the Martin Reservoir to Stone House Road. Further, the Defendants have the right to use the multi-slip boat dock that is attached to the Plaintiff's property. The Court finds that it would not be equitable to now remove the Defendants from the easement or from the use of the boat slips when the Defendants' right to access to Lake Martin was clearly established prior to the Plaintiff's purchase of Lot D by virtue of the easement and subsequent boat slip license agreements appearing of record in Tallapoosa County Probate Office. Upon consideration of all of the evidence, the Court finds that the Defendants have a valid

easement for ingress and egress across the Plaintiff's property for pedestrian access from Stone House Road to the Martin Reservoir, and the Defendants have the right to use the multi-slip boat dock that is attached to the Plaintiff's property. It is ORDERED, ADJUDGED and DECREED as follows:

"1. In response to the Plaintiff's Request for Declaratory Judgment, the Court states and declares that the Easement for Pedestrian Ingress and Egress is valid and enforceable and that the Defendants may use the specific dimensions and terms of the easement for access to Lake Martin as described in Plaintiff's Exhibit 3.

"2. The Plaintiff's Request for Ejectment of Defendants from Servient Estate in Relation to Pedestrian Easement is DENIED IN PART and GRANTED IN PART. The Defendants may use the specific dimensions and terms of the easement as stated above. The Defendants are immediately ejected from any remaining portions of the Plaintiff's property and the Defendants shall not use any portion of the stairs or boardwalk that crosses Plaintiff's property outside of the 10-foot easement. The Defendants shall take the necessary steps to make the specific terms and dimensions of the easement usable within sixty (60) days of the date of this Order and shall be responsible for all costs associate therewith.

"3. The Plaintiff's request to eject the Defendants from the boat slips is DENIED. The Defendants have a right to use the boat slips as stated in their individual Boat Slip License Agreements and the Plaintiff's unilateral termination of said Agreements is hereby invalidated. Understanding that the easement, as defined, does not currently connect to the boat slips at the full pool line, the Defendants must obtain the necessary approval from the licensing authority to access the boat slips from the easement area without trespassing upon the Plaintiff's property. Until such time as the approval to connect the easement to the boat slips is confirmed by Alabama Power Company and construction is complete, the

Defendants may only access the boat slips from the waters of Martin Reservoir.

"4. Any other relief that is not specifically addressed herein is DENIED.

"5. This is a FINAL ORDER."

(Capitalization in original.)

On June 21, 2023, Hynes filed a postjudgment motion. On June 29, 2023, the defendants filed a response to the postjudgment motion. On July 5, 2023, the trial court denied the motion. On August 1, 2023, Hynes filed a timely notice of appeal to the Alabama Supreme Court.

On August 21, 2024, the supreme court entered an order transferring Hynes's appeal to this court on the authority of Coprich v. Jones, 406 So. 3d 58 (Ala. 2024). The supreme court further ordered that if this court were to conclude that the amount in controversy exceeded this court's monetary jurisdictional limit of $50,000 so as to cause the appeal to fall within the "original appellate jurisdiction of the Alabama Supreme Court pursuant to § 12-2-7, Ala. Code 1975, then this cause is transferred to the Court of Civil Appeals pursuant to § 12-2-7(6), Ala. Code 1975."

29

Standard of Review

" ' " 'When ore tenus evidence is presented, a presumption of correctness exists as to the trial court's findings on issues of fact; its judgment based on these findings of fact will not be disturbed unless it is clearly erroneous, without supporting evidence, manifestly unjust, or against the great weight of the evidence. J & M Bail Bonding Co. v. Hayes, 748 So. 2d 198 (Ala. 1999); Gaston v. Ames, 514 So. 2d 877 (Ala. 1987). When the trial court in a nonjury case enters a judgment without making specific findings of fact, the appellate court "will assume that the trial judge made those findings necessary to support the judgment." Transamerica Commercial Fin. Corp. v. AmSouth Bank, 608 So. 2d 375, 378 (Ala. 1992). Moreover, "[u]nder the ore tenus rule, the trial court's judgment and all implicit findings necessary to support it carry a presumption of correctness." Transamerica, 608 So. 2d at 378. However, when the trial court improperly applies the law to [the] facts, no presumption of correctness exists as to the trial court's judgment. Allstate Ins. Co. v. Skelton, 675 So. 2d 377 (Ala. 1996); Marvin's, Inc. v. Robertson, 608 So. 2d 391 (Ala. 1992); Gaston, 514 So. 2d at 878; Smith v. Style Advertising, Inc., 470 So. 2d 1194 (Ala. 1985); League v. McDonald, 355 So. 2d 695 (Ala. 1978). "Questions of

30

law are not subject to the ore tenus standard of review." Reed v. Board of Trustees for Alabama State Univ., 778 So. 2d 791, 793 n.2 (Ala. 2000). A trial court's conclusions on legal issues carry no presumption of correctness on appeal. Ex parte Cash, 624 So. 2d 576, 577 (Ala. 1993). This court reviews the application of law to facts de novo. Allstate, 675 So. 2d at 379 ("[W]here the facts before the trial court are essentially undisputed and the controversy involves questions of law for the court to consider, the [trial] court's judgment carries no presumption of correctness.").'"

"'[Farmers Ins. Co. v. Price-Williams Assocs., Inc.,] 873 So. 2d [252,] 254-55 [(Ala. Civ. App. 2003)] (quoting City of Prattville v. Post, 831 So. 2d 622, 627-28 (Ala. Civ. App. 2002)).'

"Kellis v. Estate of Schnatz, 983 So. 2d 408, 412 (Ala. Civ. App. 2007)."

Ross v. West Wind Condo. Ass'n, [Ms. CL-2023-0829, Feb. 7, 2025] ___ So. 3d ___, ___ (Ala. Civ. App. 2025).

Discussion

Hynes argues (1) that the pedestrian easement granted by Rodan Land to Stoney Ridge AL failed to create an easement appurtenant and was instead an inalienable easement in gross; (2) that Rodan Land, as the holder of the lakeshore permit from Alabama Power to use the dock

31

and connected boat slips, was the only entity capable of extending the boat-slip license agreements to the defendants; (3) that the boat-slip license agreements between the defendants and Stoney Ridge AL were revocable licenses because Stoney Ridge AL never had a permit from Alabama Power regarding the dock and boat slips; and (4) that the terms of the boat-slip license agreements provided that the licenses were contingent upon continued permission from Alabama Power, that Rodan Land no longer held the permit, and that Hynes now held the permit.

It is undisputed that Rodan Land entered into an express easement agreement with Stoney Ridge AL to allow pedestrian ingress and egress across lot D.

> "'An easement, although an incorporeal right, ... is yet properly denominated an interest in land, ... and the expression "estate or interest in lands" is broad enough to include such rights; for an easement must be an interest in or over the soil.' Oates v. Town of Headland, 154 Ala. 503, 505, 45 So. 910, 911 (1908) (quoting 14 Cyc. 1139, nn. 6 and 7)."

West Town Plaza Assocs., Ltd. v. Wal-Mart Stores, Inc., 619 So. 2d 1290, 1295 (Ala. 1993).

> "'The essential qualities of easements are: first, they are incorporeal; second, they are imposed upon corporeal property; third, they confer no right to a participation in the profits arising from such property; fourth, in the case of an appurtenant easement there must be two distinct tenements,

the dominant to which the right belongs, and the servient upon which the obligation rests.' 9 R.C.L. 735, § 3; 17 Am. Jur. 925 § 3."

Louis Pizitz Dry Goods Co. v. Penney, 241 Ala. 602, 605, 4 So. 2d 167, 169 (1941).

An easement appurtenant has a dominant estate and a servient estate and is created for the advantage of the owner of the dominant estate. Weeks v. Wolf Creek Indus., Inc., 941 So. 2d 263 (Ala. 2006). "'A dominant estate is the one enjoying the easement, and to which it is attached; the servient estate is the one upon which the easement is imposed.'" Walker v. Clifford, 128 Ala. 67, 74, 29 So. 588, 591 (1901) (quoting Tiedeman on Real Property § 497). An easement appurtenant cannot exist separate and apart from the dominant estate. M & M Inv. Co. v. Regency Oaks Apts., 517 So. 2d 591 (Ala. 1987). For an easement to be appurtenant, it must be attached to the dominant estate; it is legally attached to the dominant estate when there is unity of title in the same person to both the dominant estate and the easement claimed. See Crawford v. Tucker, 258 Ala. 658, 662, 64 So. 2d 411, 415 (1953) (opinion on rehearing) ("A conveyance of a lot 'with appurtenances thereto' without an intention therein manifest to include an easement (here the

driveway) over the land of the grantor does not grant such an easement …. It is only an easement which exists on land of a third person which can be appurtenant to the land conveyed so as to pass with the conveyance without reference thereto in the deed."). In contrast, an easement in gross is an easement that is personal to the easement owner because it operates not to serve a particular tract of land, but to serve the easement owner. Weeks, 941 So. 2d 263. Put another way, there is no dominant estate with respect to an easement in gross because the easement is personal to the easement holder. Id.

The Supreme Court of North Carolina explained why an easement appurtenant requires that both the easement and the dominant estate be held by the same person:

"An easement appurtenant is incapable of existence apart from the particular land to which it is annexed, it exists only if the same person has title to the easement and the dominant estate; it must bear some relation to the use of the dominant estate, and it must agree in nature and quality to the thing to which it is claimed to be appurtenant. An easement appurtenant is incident to an estate, and inheres in the land, concerns the premises, pertains to its enjoyment, and passes with the transfer of the title to the land, including transfer by descent. 17A Am. Jur., Easements, ss. 9, 11, pp. 624, 625, 627. If an easement is in gross there is no dominant tenement; an easement is in gross and personal to the grantee because it is not appurtenant to other premises. ibid., pp. 626-7. An

34

easement in gross attaches to the person and not to land. 89 A.L.R. 1189."

Shingleton v. State, 260 N.C. 451, 454, 133 S.E.2d 183, 185-86 (1963).

See also Town of Carrboro v. Slack, 261 N.C. App. 525, 530, 820 S.E.2d 527, 532 (2018) ("A landowner cannot create an easement appurtenant in a transaction with a complete stranger to the dominant estate."); Hyde Rd. Dev., LLC v. Pumpkin Assocs., LLC, 130 Conn. App. 120, 130, 21 A.3d 945, 951 (2011) ("[T]he valid creation and execution of an express easement appurtenant mandates that the express grantee of the easement appurtenant must also be the owner of the dominant estate that the easement is intended to benefit."); Newman v. Michel, 224 W. Va. 735, 741-42, 688 S.E.2d 610, 616-17 (2009) ("The main features of an easement appurtenant are that there must be both a dominant and servient estate; the holder of the easement must own the dominant estate; the benefits of the easement must be realized by the owner of the dominant estate; and these benefits must attach to possession of the dominant estate and inhere to and pass with the transfer of the title to the dominant estate."); Yaali, Ltd. v. Barnes & Noble, Inc., 269 Ga. 695, 695-96, 506 S.E.2d 116, 117-18 (1998) ("The creation of an easement appurtenant requires that the grantee of the easement own the dominant

estate, the land benefitted by the easement. This principle is known as 'unity of title.' Without unity of title, no easement appurtenant can be created.").

In PAJ Investment Group, LLC v. El Lago N.W. 7th Condominium Ass'n, 405 So. 3d 401 (Fla. Dist. Ct. App. 2024), a Florida appellate court affirmed a trial court's finding that a particular easement was an easement in gross and not an easement appurtenant. In PAJ, a property developer was the principal and managing partner in American Properties, Ltd. American Properties had owned all the subject properties at issue in that appeal. A separate corporation operated a condominium on lots numbered 17-21. In 1980, American Properties granted "right-of-way" easements on the sides of those numbered lots to Tamiami Sports, Inc. Tamiami Sports was a separate corporate entity established by the developer and in which the developer was the primary shareholder. Subsequently, PAJ Investment Group, LLC, purchased lots 17-21 pursuant to a tax-deed sale and sought to sell them to another developer. The condominium association terminated PAJ's access to the easements. PAJ commenced a declaratory-judgment action, asserting that the easements were easements appurtenant, and it also sought

36

injunctive relief to prevent interference with the easements. The trial court, in determining that the easements were in gross, reasoned that PAJ was not a direct corporate successor to Tamiami Sports, that Tamiami Sports did not own any property, and that the language of the easement instruments did not describe lots 17-21 or a dominant estate in any manner.

In PAJ, the Florida appellate court noted that American Properties had initially owned all the subject properties. The developer created Tamiami Sports, a separate and distinct corporate entity. American Properties then granted Tamiami Sports easements on the property where the condominium was located. At that time, American Properties owned the condominium and lots 17-21. Tamiami Sports never owned or later acquired any property. Thus, Tamiami Sports was a stranger to the purported dominant estate, i.e., lots 17-21. The appellate court agreed that the easements were not connected to a dominant estate and stated that the holder of the easements, Tamiami Sports, did not own the dominant estate. Thus, the Florida appellate court said, an easement appurtenant never came into existence. The appellate court also rejected PAJ's attempt to use the developer's interests in the corporate entities

37

involved to pierce the corporate veil. The court noted that, even though the developer was the principal or the owner of all the pertinent corporate entities, the entities all retained a separate legal status under Florida law.

> "Similarly, PAJ focuses on the easement being 'nonexclusive.' But exclusivity concerns the scope of the easement -- not whether the easement is appurtenant or in gross. 'An exclusive easement is one for the sole benefit of the easement holder and excludes use thereof by the grantor servient owner. A non-exclusive easement, on the other hand, permits use by the servient owner.' Gelfand v. Mortgage Inv'rs of Washington, 453 So. 2d 897, 898 (Fla. [Dist. Ct. App.] 1984) (citing R. Boyer, Florida Real Estate Transactions § 23.04).

> "Based on the above, we find that the easements are in gross. Since it did not own Parcels 17-21, Tamiami Sports' rights were not connected to a dominant estate. See [Jon. W.] Bruce & [James W.] Ely, [Jr., The Law of Easements & Licenses in Land] § 2:3 [(2024)] ('Where an easement does not benefit the owner of a particular tract, it is in gross.'). Tamiami Sports was a stranger to Parcels 17-21.

> "Even though easements in gross are not favored by the common law and the courts of this state, we cannot ignore the fact that one of the necessary elements of easements appurtenant is missing. Without this necessary element, an easement appurtenant never arises. The broad-sweeping language in the easements does not change this fact. Accordingly, we affirm the trial court's involuntary dismissal of this case."

PAJ, 405 So. 3d at 411.

In the present case, Rodan Land acquired lot D, lot 47, and lot 57, and Holland Homes acquired an interest in lot 41. Subsequently, Rodan Land transferred its interest in lots 47 and 57 to Holland Homes. Rodan Land, as the owner of lot D and the grantor of the easement, then granted Stoney Ridge AL a pedestrian easement across lot D. Stoney Ridge AL, the holder of the easement, never owned or had any interest in any of the properties. Stoney Ridge AL was a stranger to the purported dominant estate, consisting of lots 41, 47, and 57. For an easement appurtenant to exist, there must be two estates: the dominant estate to which the easement belongs and the servient estate upon which the obligation rests. Here, the pedestrian easement granted to Stoney Ridge AL across lot D was not connected to a dominant estate owned by Stoney Ridge AL.

We note that, although Holland was a member in the business entities involved, those limited-liability companies all retained a separate legal status under Alabama law. As Justice Cook explained in his special concurrence in <u>Bento v. Bento</u>, 401 So. 3d 244, 248-49 (Ala. 2024),

> "[u]nder Alabama law, [a limited-liability company ('LLC')] is an artificial person -- that is, it has its own existence similar to a corporation. <u>See</u> § 10A-5A-1.04(a), Ala. Code 1975 ('A limited liability company is a separate legal entity.'); <u>Childs</u>

v. Pommer, 348 So. 3d 379, 391 (Ala. 2021) (noting that, in the context of an LLC, ' "[t]he concept that a corporation is a legal entity existing separate and apart from its shareholders is well settled in this state" ' (citation omitted)); Ex parte Alabama Power Co., 369 So. 3d 662, 672 (Ala. 2022) (Mitchell, J., concurring in the result) (noting the corporate-formality similarities in LLCs and 'corporations,' a term which 'traditionally encompassed any artificial separate legal personality, capable of continuous existence, that is created and invested with its powers by positive law').

"The members of an LLC do not own particular assets or even portions of particular assets of the company. See § 10A-5A-4.02, Ala. Code 1975 ('A member has no interest in any specific property of a limited liability company or a series thereof.'). Instead, the members own only an interest in the LLC. See Bradley J. Sklar & W. Todd Carlisle, The Alabama Limited Liability Company Act, 45 Ala. L. Rev. 145, 205-06 (1993) (' "[A]ll property originally contributed to the limited liability company or subsequently acquired" becomes LLC property for which no member has any specific interest. Unlike partnership property under the [Uniform Partnership Act], LLC property is owned by the firm itself rather than nominally or otherwise by the members.' (emphasis added; footnotes omitted))."

The easement instrument between Rodan Land and Stoney Ridge AL never established an easement appurtenant. Instead of creating an easement appurtenant, the easement instrument between Rodan Land and Stoney Ridge AL created an easement in gross. An easement in gross has no dominant estate because it serves no particular tract of land and

is personal to the easement owner. Weeks, 941 So. 2d 263. As explained in a noted treatise on Alabama property law:

> "The easement in gross has no dominant tenement and, as such, has traditionally been considered personal to the owner or holder of the easement. While the easement in gross may exist for various purposes, the most common purposes are for some form of infrastructure such as utility lines, and the like. Under the common law, the easement in gross was considered a personal right in the land of another, and thus inalienable inter vivos or otherwise. Most courts in the United States have rejected this rule, particularly where the easement in gross is for a commercial purpose. Accordingly, though some easements in gross may remain inalienable, those created for a commercial purpose are alienable.
>
> "Alienability of a commercial easement in gross was at issue in Cousins v. Alabama Power Company[, 597 So. 2d 683 (Ala. 1992)]. In that case the question was whether the holder of a commercial easement in gross could share its easement with another commercial user without the consent of the owner of the servient estate and whether additional compensation would be due to the servient owner. Looking largely to the language of the instrument creating the easement, the Alabama Supreme Court held that the sharing, or partial transfer, would not create an additional burden and would be allowed."

1 Jesse P. Evans III and J. Price Evans IV, Alabama Property Rights & Remedies § 6.5[c] (6th ed. 2024) (footnotes omitted).

> "The widespread use of easements in gross for such commercial activities as telephones, pipelines, transmission lines, and railroads caused judges to reconsider the rule prohibiting transfer. Most courts have followed the leading case of Miller v. Lutheran Conference & Camp Ass'n[, 331 Pa.

241, 200 A. 646 (1938),] and have allowed the transfer of commercial easements in gross. Hence, the modern American view is that commercial easements in gross are freely alienable as a matter of law, unless the instrument of creation provides to the contrary.

"Since noncommercial easements in gross are treated as a right of personal enjoyment for the original holder, courts are disinclined to regard such servitudes as transferable. Unanticipated burdens on servient estate are thus prevented. This approach, however, requires judges to distinguish between commercial and noncommercial easements. Courts must analyze an arrangement and decide whether the rights conferred are primarily for economic benefit or for personal enjoyment. Courts have readily concluded that easements in gross for utility purposes are commercial in nature. Other easements in gross found to be commercial in nature include a parking lot easement used in connection with a business, easements for boating, fishing, and swimming utilized for business purposes, and a prescriptive easement to drive a herd of cattle being raised for profit. Similarly, an easement in gross for the storage of water was deemed commercial in nature.

"Recreational rights, such as hunting, camping, and fishing, are the most common examples of noncommercial servitudes in gross. Other types of noncommercial easements in gross also exist. For example, a servitude created by the phrase 'reserved as a roadway for use of the parties' was found to be a personal easement in gross that was not inheritable. Likewise, a prescriptive easement in gross to moor a houseboat was treated as an unassignable personal right."

Jon W. Bruce, James W. Ely, Jr., and Edward T. Brading, The Law of Easements & Licenses in Land § 9:5 (2025) (footnotes omitted).

In the present case, the pedestrian easement in gross between Rodan Land and Stoney Ridge AL did not involve commercial or utility uses. The pedestrian easement was a personal right granted by Rodan Land to Stoney Ridge AL for the nonexclusive use of the easement across lot D. Lot D is now owned by Hynes. While Hynes had knowledge of the easement, Hynes's knowledge of the permissive use of the easement by the defendants, without more, did not justify subjugating Hynes's interest in lot D. See Bruner v. Walker, 366 So. 2d 695 (Ala. 1978) (holding that, when no valid easement had existed at the time predecessor in title sold the property to the plaintiffs, the plaintiffs' knowledge of permissive use of water and sewer lines by the neighboring property owner did not justify subjecting the plaintiffs' interest in the property to a claim of right to the water and sewer lines asserted by the neighboring property owner).

We now turn to the boat-slip license agreements. Generally, a license creates a personal right that the licensor may revoke at will. Camp v. Milam, 291 Ala. 12, 17, 277 So. 2d 95, 99 (1973). "A license does not pass any interest in the property to the licensee. It only makes an action lawful, which without a license would have been unlawful."

43

Shearer v. Hodnette, 674 So. 2d 548, 551 (Ala. Civ. App. 1995). However, when the licensee makes expenditures that were contemplated by the licensor, "for reasons founded upon the equitable principle of estoppel, [the license] becomes irrevocable and confers upon the licensee a substantive equitable right in the property." Camp, 291 Ala. at 18, 277 So. 2d at 99.

In Blackburn v. Lefebvre, 976 So. 2d 482 (Ala. Civ. App. 2007), this court addressed access to certain boat slips. In Blackburn, the main issue was whether the plaintiffs (the Lefebvres) had a right to access and use a boat slip and pier located on the property of the defendants (the Blackburns). Mary Marler and her husband had created a family subdivision of three contiguous lots. One of the lots, parcel A, was adjacent to a creek. Parcel B was between parcel A and the third lot, parcel C, which was adjacent to parcel B and to a public road. The Marlers built a pier and a boat slip on parcel A. The Marlers sold parcels B and C to family members and allowed them to use those structures. The Lefebvres purchased parcel B from the Thompsons (the Marlers' relatives) and entered into a boat-slip agreement with the Marlers, the Thompsons, and the Belews (the Marlers' relatives and the owners of

44

parcel C) regarding the use of the pier and the boat slip. The agreement provided:

> "'The parties agree that the Purchasers shall be entitled to an easement to access and use the existing boat slip currently being used by the Sellers. This right shall accrue only to the benefit of the Purchasers and shall be non-assignable by them and shall not run with the property. Any improvements or alterations to the easement for access to the boat slip, or to the boat slip itself shall require the approval, in writing, of all owners of the property over which the easement runs and where the boat slip is constructed. Purchasers agree to have all owners of the property over which the easement and boat slip runs to sign an agreement to this effect.
>
> "'....
>
> "'The Purchasers agree to pay the sum of Two Hundred Dollars ($200.00) per annum to Marler. Said payments are to be due on or before October 1st of each year, commencing with October 1, 2004.
>
> "'This "Family Subdivision" was established with the understanding that all three owners will have equal access to easement, dock and boat slips.'"

976 So. 2d at 486. Subsequently, the Marlers sold parcel A to the Blackburns, who denied the Lefebvres the right to use the pier and boat slip.

In <u>Blackburn</u>, this court first addressed whether the agreement created a license or an easement.

45

"Concerning the proper interpretation of agreements creating licenses or easements, we note the following general principles. First, '"[t]he construction of a written document is a function of the court."' Jehle-Slauson Constr. Co. v. Hood-Rich, Architects & Consulting Eng'rs, 435 So. 2d 716, 720 (Ala. 1983) (quoting Wheeler v. First Alabama Bank of Birmingham, 364 So. 2d 1190, 1194 (Ala. 1978)). 'In the absence of fraud or mistake, it is only where the instrument is doubtful of meaning, or its language ambiguous, that the court may look beyond the "four corners" of the instrument to give clarity and specificity of meaning.' Camp v. Milam, 291 Ala. 12, 16-17, 277 So. 2d 95, 98 (1973); see also David Lee Boykin Family Trust v. Boykin, 661 So. 2d 245, 251 (Ala. Civ. App. 1995) ('The substantive rules governing licenses are the same as those governing contracts.').

"The critical factor in determining whether parties created an easement or a license is the parties' intent. James v. Brewster, 954 So. 2d 594, 600 (Ala. Civ. App. 2006) (citing Boyce v. Cassese, 941 So. 2d 932, 941 (Ala. 2006)). In determining whether the parties created an easement or a license, we also look to the surrounding circumstances. See Drummond Co. v. Walter Indus., Inc., 962 So. 2d 753 (Ala. 2006) (citing Jon W. Bruce and James W. Ely, Jr., The Law of Easements & Licenses § 11:1 (West 2001)).

"Concerning the distinction between easements and licenses, we note that, on the one hand, '[n]onpossessory property rights such as covenants and easements are said to "run with the land," becoming an incident of ownership, and they are generally not personal.' Budget Inn of Daphne, Inc. v. City of Daphne, 789 So. 2d 154, 159 (Ala. 2000). In contrast, '[a] license denotes the "giving of one's consent" to do or perform a specified activity; a license is a personal privilege and is generally revocable at the will of the licensor.' Wehby v. Turpin, 710 So. 2d 1243, 1251 (Ala. 1998) (citing Camp v. Milam, 291 Ala. at 17, 277 So. 2d at 99)."

46

976 So. 2d at 489-90.

In <u>Blackburn</u>, we noted that, although the pertinent agreement had used the word "easement," the agreement had also provided that the right was nonassignable and did not "run with the property." The agreement also provided that the Lefebvres had to obtain permission from the other property owners before making improvements or alterations to the pier or boat slip. The testimony of the parties had established that the Lefebvres' use of the pier and boat slip had been intended to be personal to them, that the parties had intended that the Lefebvres have no right to transfer or convey their right to use the pier and boat slip, and that the interest conferred was not to run with the land. Accordingly, this court concluded that the agreement did not create an easement but created a license.

This court went on to conclude that the language used in the parties' agreement envisioned the creation of a property interest that was greater, or more permanent in nature, than a mere revocable license. In determining that the pertinent boat-slip license in <u>Blackburn</u> was irrevocable, this court relied upon <u>Tatum v. Dance</u>, 605 So. 2d 110, 112 (Fla. Dist. Ct. App. 1992) (holding that oral drainage license became

irrevocable when licensee constructed an automobile dealership in reliance upon the licensor's permission, and construction of the dealership depended on the drainage design, and that, although a license may be enforced against the licensor's successor for equitable reasons, there was no similar basis to allow the licensee to transfer the license); Morning Call, Inc. v. Bell Atlantic-Pennsylvania, Inc., 761 A.2d 139, 144 (Pa. Super. Ct. 2000) (holding that telephone-service provider acquired an irrevocable license when it placed its equipment on a building to provide telephone service and that, therefore, the current building owner had to pay for cost of relocating equipment when building was demolished because the telephone-service provider's use of land was permissive, highly specific, and narrowly defined to install telephone equipment, the burden on the land was minimal, there was mutual benefit to the building owner, and the service provider had installed equipment on premises and had continued to make additional expenditures to maintain and modernize the equipment);  and Loid v. Kell, 844 S.W.2d 428, 430 (Ky. Ct. App. 1992) (holding that persons who had entered into written contracts for the burial of their pets with the property owner did not have an easement by estoppel or a license against subsequent purchaser of

land where the pet cemetery was located). In <u>Blackburn</u>, the court reasoned that the Marlers had benefited from the plaintiffs' reliance upon the license because the plaintiffs had rebuilt the damaged pier and boat slip following damage from a hurricane, the Marlers' relatives were able to sell their property to the plaintiffs because of the boat slip, and the Marlers were paid $200 pursuant to the agreement.

In contrast, however, in the present case, the boat-slip license agreements between Stoney Ridge AL and the defendants were revocable. First, the terms of the license agreements provide that the licenses were between Stoney Ridge AL and the defendants. However, Rodan Land had the nontransferable permit from Alabama Power for use of the dock and connected boat slips. The terms of the license agreements provide that the license to use the dock and boat slips is contingent upon permission from Alabama Power. Hynes now has a nontransferable permit from Alabama Power for the dock and boat slips. Second, the defendants have not shown that they expended money on the dock and boat slips, other than for maintenance and minor repairs, that would warrant treating the licenses as irrevocable based on equitable principles.

Conclusion

Originally, Stoney Ridge GA acquired lot D with the dock and boat slips attached to the lot. There was no house on lot D at that time. Although the original intent may have been to allow all the residents of the Preserve to park on lot D and use the dock and boat slips on a first-come, first-served basis, a house was later constructed on lot D and eventually purchased by Hynes. The pedestrian easement across lot D granted by Rodan Land to Stoney Ridge AL was a nontransferable easement in gross. Stoney Ridge AL and the defendants' boat-slip license agreements created revocable licenses, and Hynes validly revoked any permission the defendants had had to use the dock and boat slips. Accordingly, the judgment of the trial court is reversed, and the cause is remanded for proceedings consistent with this opinion.

REVERSED AND REMANDED.

Edwards, Fridy, and Bowden, JJ., concur.

Moore, P.J., concurs in the result, without opinion.